[Crim. No. 21423. Sept. 30, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
VINCENT M. ARCEGA, JR., Defendant and Appellant.

**COUNSEL**

Roderick P. Bushnell, under appointment by the Supreme Court, and Bushnell, Caplan, Fielding & Rudy for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BIRD, C. J.**—This is an automatic appeal from a judgment imposing a penalty of death. (See Pen. Code, § 1239, subd. (b).)[1]

---

[1]All statutory references hereafter are to the Penal Code, unless otherwise indicated.

Appellant, Vincent M. Arcega, Jr., was accused of the first degree murders of Marilyn Milner and Leila Blessing, also known as Julie Blessing. (§§ 187, 189.) A special circumstance was alleged as to each count that appellant was personally present during the commission of the act or acts causing the death, had physically aided or committed such act or acts with intent to cause death, and had in this case been convicted of first degree murder and an additional count of murder in the first or second degree. (Former § 190.2, subd. (c)(5).)

In January 1979, appellant was declared mentally incompetent to stand trial and was committed to a state hospital. In August 1979, he was returned as competent. A jury trial in December resulted in a verdict that appellant was competent. In the competency proceedings, there were indications that appellant had been feigning mental illness to avoid trial. He failed to respond to questions when called as a witness at the competency trial and kept his head buried in his arms throughout both the competency trial and the trial at which he was convicted and sentenced to death.

At the trial on guilt or innocence, appellant did not deny responsibility for the killings. The defense sought to establish that the killings were not first degree murders since appellant did not premeditate or deliberate, within the meaning of section 189. The defense also relied on appellant's extrajudicial claims of intoxication and on certain testimony regarding a head injury to present a diminished capacity defense to the jury. However, no expert opinion evidence was introduced to establish that the claimed intoxication and/or head injury would have caused diminished capacity. Finally, the defense argued heat of passion in an attempt to reduce the offense to manslaughter. The jury apparently rejected the defense contentions and returned verdicts of guilty as charged.

Since appellant had entered a plea of not guilty by reason of insanity, the next phase of the trial addressed the question whether he was legally insane at the time of the commission of the killings. No additional evidence was introduced at this phase. The jury found appellant sane.

Other than a stipulation as to appellant's age, no further evidence was admitted at the penalty phase of trial. Upon the completion of argument, the jury retired and subsequently returned with its judgment imposing death.

## I.

At the time of the killings, appellant was living at the home of one of the victims, Marilyn Milner. Appellant, 27 years old and with no significant prior criminal record, was employed as a clerk-typist at a state mental hospital. He had been born in the Philippines, entered the United States with his parents in November 1970, and was subsequently naturalized as a citizen.

Appellant had first encountered Milner in 1975 when she solicited him for an act of prostitution. Appellant purchased Milner's services on numerous occasions over an extended period of time.

In March 1978, Milner found herself in bad financial shape. Appellant contacted her and stated that he would like to move in with her. Milner agreed. According to Milner's mother, Milner told appellant that he would have his own room and was not to enter hers. As long as he obeyed the rules, he could live in her apartment. Appellant moved in and began paying some of the bills.

Around the same time that appellant moved in, Milner began dating Enrique Contreras. On occasion, she spent the night at his house. Contreras testified he spoke with Milner on the telephone at approximately 11:30 p.m. on June 1, 1978, the night of the killings. According to Milner's mother, Milner had told appellant to move out by this date. She was planning to visit her father in Seattle in the event appellant had not yet done so. Milner's father also testified that his daughter was planning to visit him at that time.

Sometime before June 1, Milner had met and befriended Leila Faye Barkley Blessing, also known as Julie Blessing. Blessing was a 15-year-old runaway from New Jersey. Milner permitted her to live in the apartment, sleeping on the living room couch.

Lorene Jacobsen, a friend of Milner, testified that she spoke to Milner on the phone the night of June 1. The conversation lasted several hours, terminating about 1 a.m. on June 2. Before they hung up, the two women decided that whichever one awoke first the next morning would call the other. Jacobsen testified that she tried calling the next morning but received no answer.

On the afternoon of June 2, Milner's brother, Steve Henriksen, went to the apartment. His knock on the door was unanswered, so he let himself in with his own key. He noticed that things had been misplaced, although his sister was normally a neat housekeeper. He opened the door to the bedroom and went in. Upon entering, he saw his sister lying on the bed with a pillow close to her head. He touched her to see if she was alive; she felt cold.

Henriksen saw a telephone lying unplugged on the floor of the bedroom. He took it into the living room in order to plug it in and call the police. He had dialed the operator when he noticed Blessing's body on the couch. At that point, he became hysterical and ran out of the house screaming.

Long Beach Police Officer Dennis Bracken testified that he received a call at 4:50 p.m. on June 2 to investigate a possible murder at the address of Milner's apartment. Upon arrival, he found Henriksen outside in an hysterical condition. Bracken noticed that the apartment's shades were down and the curtains drawn.

Inside the living room, Officer Bracken found Blessing's body. She was in a kneeling position with her head on the couch. A blanket partially covered her legs. There was a substantial amount of blood on her body and the couch. There was also blood on the nearby wall. Blessing was pronounced dead at the scene.

The officer then proceeded to Milner's bedroom. She was lying on her bed with blood over her body and a pillow over her face. She was wearing a T-shirt or nightgown which was pulled up over her breasts, but no other clothing. Her legs were spread and her arms were folded. Bracken noticed stab wounds and what appeared to be strangulation marks on her throat. Milner was also pronounced dead. Next to the bed was a knife with blood on it. At the foot of the bed were four empty sixteen-ounce cans of beer and a bloodstained beer carton.

When Blessing's body was lifted for the coroner to remove, a metal object fell from her skull. Bracken subsequently found a skillet in the oven with a piece missing. Hair and blood were in the kitchen sink. There were numerous bloodstains. There was also blood on the doorbell, which had been disconnected. A second bloodstained beer carton was found in the kitchen.

In the bathroom, Bracken found more bloodstains and a number of electrical cords. One cord had been wrapped around the faucet, another was hanging down from the door. On the mirror, he saw the words "I love you, Marilyn" written in blood. On the wall, also written in blood, were the words, "I love you, Marilyn, P.E."[2]

Bracken noticed two telephones in the apartment. One was in the living room and was plugged into the wall. The other was near the door to the bathroom, upside down and lacking any wires.

Dr. Eugene Carpenter performed the autopsies. He testified that the causes of Milner's death were brain damage, loss of blood, and/or suffocation. There were five or six stab wounds to the left back. In addition, Milner suffered multiple lacerations of the scalp caused by "[c]onsiderable" force. The lacerations could have been caused by the iron skillet. Milner may have died from suffocation, either from accumulated blood or from pressure exerted on the pillow over her face. Dr. Carpenter estimated that she had lived, in a coma, 30 minutes to several hours after the injuries.

Blessing's death was due to brain damage resulting from multiple blunt force injuries. She had suffered instant death as a result of "damage to the medulla." There were wounds on the arm and shoulder indicating an attempt to avoid the blows to her head. She had received 10 to 12 blows in all.

Donald McLaury, a disabled neighbor who spent much of his time watching the neighborhood from his front window, testified that it was unusual for the curtains to be drawn and the shades down in Milner's apartment. Even at night, he stated, they were always up. However, Steve Henriksen testified that he would not consider it unusual for the shades to be closed.

Manhattan Beach Police Officer Robert Bey testified that he and his partner, Terry Charles, were on patrol near the ocean pier about 3 a.m. on June 3. They were approached by someone who said a person was drowning near the end of the pier. They went to the end of the pier and saw a man floating on his back in the water and calling for help. The officers were unable to rescue the man and soon lost sight of him. Approximately 30 minutes later, they found a man lying on the sand near the edge of the water. There were purplish marks on his neck and both

---

[2]Milner referred to appellant as "Perry."

wrists. From the documents in the man's pocket, they identified him as appellant. He was alive and appeared to be "coherent but disoriented." Appellant did not know where he was or why he was there, but he stated that he had attempted to kill himself. He further stated that he had taken a bus and jumped from the Redondo Beach Pier (another pier). Appellant did not appear to know who the officers were, although they were in uniform. According to Bey, appellant "would be asked one question and would give a part of an answer that made no sense and did not pertain to what—the substance of the question."

Appellant was taken to the Kaiser Hospital in Harbor City. Myrna Rapacon, a registered nurse, encouraged appellant to talk about his apparent suicide attempt. At first, appellant was reluctant to talk about it, but eventually he told Rapacon that he had had a fight with his girlfriend. According to Rapacon's testimony, he said that he had fought with her because she was fooling around with other men. He said that he had had a blurred vision and had killed her. He also admitted killing another female at the apartment. He further stated that he had tried to kill himself by slashing his wrists, attempting to hang himself, and taking a whole bottle of sleeping medicine before jumping in the ocean. When Nurse Rapacon first saw appellant, he was shaking and nervous and appeared to be cold. However, he seemed calm during this conversation.

Virginia Domingo, another registered nurse at the hospital, spoke with appellant after Nurse Rapacon. He admitted killing his girlfriend, naming Milner, and said that he had hit her with a skillet. He also said that he had killed another girl. Appellant stated that he had "made sure that she was killed before I left the apartment," but it is unclear to which of the victims this statement refers. Appellant told Nurse Domingo that he felt hurt and angry by the fact that he was paying for Milner's rent but she was seeing other men.

Dr. Charles Wolff, a hospital psychiatrist, also examined appellant. Dr. Wolff testified that appellant did not have much memory of the events, but did not appear to be suffering any delusions. Appellant said that he had hit his girlfriend with an object which he thought was a pot. Appellant stated that he was jealous, hurt, and frustrated. Appellant further stated that he had been drinking pretty heavily and had also smoked marijuana.

Long Beach Police Detective Logan Wren testified that he went to the hospital about 3 p.m. on June 3 to take appellant to the police station. Wren was told by Officer Samanaria that appellant had been advised of his rights and had indicated he wanted an attorney present during any questioning. As he was getting out of bed, appellant said, "I'm sorry, I killed Marilyn. I love Marilyn. I killed her because she was messing around with those other guys. [¶] I had to kill Julie because she was there and would have told the police if I had not."

Once in the police vehicle, appellant made similar statements. Detective Wren asked him, "Are you now waiving your right to remain silent and do you no longer wish to have an attorney?" Appellant replied, "Attorney wouldn't do me any good now. I will talk to you."

Wren waited until they arrived at the police station before questioning appellant further. Two other officers were present when Wren advised appellant of his rights. Appellant indicated his willingness to waive his rights. A tape recorder was set up and appellant was questioned about the crimes.

Appellant admitted committing both homicides. He stated that he had moved into the apartment at Milner's request but, soon after, she had met Contreras, whom she referred to as Henry. According to appellant, Milner seemed "like she's so crazy about Henry and she just hate me." Milner told appellant that she was going to throw him out of the apartment and told him, "Stay away from me, Perry." Then, Milner started seeing two other men, Steven and Vincent. This angered appellant, who was no longer having sexual relations with Milner. Appellant stated that, during this entire period, he was paying the rent and phone bills for the apartment.

On June 1, appellant came home about 7 p.m. and gave Milner $15 for pocket money. He said that they started drinking; he drank Coors beer while she drank Smirnoff vodka. They also smoked marijuana. Milner eventually fell asleep in her bed around 1 a.m. Appellant stated that he kept drinking because of his frustrations with the situation. He "went crazy that night," took a frying pan out of the oven and hit Blessing while she slept. Then he went into Milner's room and hit her about 10 times on the head. Appellant then cut his wrists so that he would also die. He disconnected the doorbell "so no one can be bugging us" and lay down next to Milner. He pulled up her blouse so that her breasts were exposed and hugged and kissed her but did not have sex

with her. When appellant realized that he was not going to die from slashing his wrists, he went into the bathroom and attempted to hang himself. He also wrote the two messages found in the bathroom. After his hanging attempt failed, he drank a bottle of Listerine, which made him vomit.

Sometime around noon, he left the house and bought a bottle of Nytol at a drugstore. He then took a bus to the beach and jumped off the pier.

In response to direct questions, appellant stated that he was trying to kill both victims when he hit them. When asked why he had killed the younger woman, he said, "I guess because I'm afraid that she might stop me from doing ... I killed her first because if she finds—if she finds out what's going on, I know she can run out of the house and call the police." When asked when he had decided to kill Milner, he replied, "I don't know. I did not decide to kill her ...."

He further stated that he had drunk one six-pack of beer the night before the crimes and one six-pack the next morning, in addition to smoking three marijuana cigarettes. At one point, though claiming intoxication, appellant stated that he remembered the killings pretty well and was "not that messed up."

This statement to police, like appellant's prior statements to the hospital personnel, included numerous expressions of remorse and suicidal intent.

At the trial, appellant presented evidence of statements made by Steve Henriksen to a police officer in which Henriksen stated that Milner had turned appellant into her "sugar daddy," taking his money without permitting sexual relations. Henriksen also had stated that Milner verbally abused appellant. In his trial testimony Henriksen denied making these statements.

Appellant's mother also testified for the defense. She stated that appellant had been hit in the head in high school and, as a result, had spent several months at home. The injury had apparently led to severe headaches, which appellant often avoided by drinking. Mrs. Arcega stated that appellant had a good work record and had been employed continuously for three years before this incident.

On rebuttal, Dr. Alex Lieberman, a psychiatrist, testified regarding his examination of appellant pursuant to court order. He concluded that, at the time of the crimes, appellant had the mental capacity to deliberate, premeditate, harbor malice, and meaningfully reflect upon the gravity of the contemplated acts. In support of this conclusion, he noted several facts: that appellant had killed Blessing first to protect his actions from being discovered; that the shades were drawn; and that the doorbell had been disconnected. Dr. Lieberman stated that the drinking of a six-pack of beer would be inconsistent with rational thought processes. Because the four beer cans found in the bedroom had blood on them and because the other evidence indicated rational thought, he concluded that appellant had drunk the four cans of beer after the killings.

Dr. Wolff also testified on rebuttal concerning his contact with appellant at Kaiser Hospital following appellant's attempt to drown himself. Finally, Officer James Settles testified concerning a conversation he had had with appellant following the tape-recorded confession. According to Settles, appellant said that he had drunk beer and smoked marijuana before the killings. However, appellant further stated that he remembered the events very well and that he was not "that messed up."

This evidence was considered by the jury in its decisions as to guilt, sanity, and penalty.

Appellant raises numerous contentions on appeal. In view of our conclusion that reversal is required as a result of the erroneous admission of certain testimony, this court need not and does not reach most of those issues.

The initial claim regarding erroneously admitted evidence concerns psychiatric testimony introduced in rebuttal at the guilt phase. (See infra, at pp. 520-526.) The psychiatrist, Dr. Lieberman, was permitted to testify that appellant had the capacity to form the requisite mental states and that appellant had been malingering prior to trial. Dr. Lieberman, while initially appointed to examine appellant to determine his sanity after entry of a plea of not guilty by reason of insanity, had recommended that appellant be found incompetent. During the first competency proceeding, the hearing was interrupted so that Dr. Lieberman could reexamine appellant. During this reexamination, appellant did not display his previously bizarre and incommunicative demeanor and gave Dr. Lieberman a detailed account of the killings. Dr. Lieberman's testimony at the guilt trial was based in great part on this examination.

There is a rule of immunity for all statements and fruits of a mental competency examination which prevents their use at the guilt trial. (*Tarantino* v. *Superior Court* (1975) 48 Cal.App.3d 465, 470 [122 Cal.Rptr. 61]; see also *Estelle* v. *Smith* (1981) 451 U.S. 454, 468 [68 L.Ed.2d 359, 372, 101 S.Ct. 1866].) The admission of Dr. Lieberman's testimony was thus erroneous.

The remaining meritorious evidentiary claims concern testimony from Milner's mother that Milner had told her in a phone call several days prior to the killings that appellant was acting "weird" by following her around the apartment, that she feared he was going to beat her up, and that she had ordered him to leave her house by "the first of the month." The statements were inadmissible hearsay and did not come within the state of mind exception as claimed by respondent. (See Evid. Code, § 1250; *infra*, at pp. 526-531.) The existence of these errors reinforces the court's conclusion that the convictions must be set aside.

## II.

■ At the outset, appellant contends that the evidence was insufficient to support the verdicts of first degree murder. He argues that the elements of malice, premeditation, and deliberation cannot be supported "in light of the substantial facts indicating that the appellant was suffering from diminished capacity." These facts include appellant's alleged ingestion of alcohol and marijuana, the asserted lack of planning, and certain of his statements to police officers.

■ This court recently reiterated the standard to be applied when a defendant challenges his conviction on the ground that the evidence was insufficient. "'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation omitted.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.'" (*People* v. *Johnson* (1980) 26 Cal. 3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738], quoting from *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].)

■ In regard to first degree murder, this court has distinguished three basic categories of evidence of deliberation and premeditation: (1) planning activity, (2) evidence of motive, and (3) facts related to the manner of killing which tend to establish a preconceived design to kill.

(*People* v. *Anderson* (1968) 70 Cal.2d 15, 26-27 [73 Cal.Rptr. 550, 447 P.2d 942].) "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.*, at p. 27.)

In the present case, there is strong evidence of motive, derived in great part from appellant's own statements. It is clear that appellant felt angry and frustrated by what he perceived to be Milner's unfair and cruel treatment of him. This situation eventually led appellant to kill Milner so as to be rid of the source of his problems. As for Julie Blessing, appellant specifically stated that he killed her to prevent her from contacting the police or otherwise interfering with Milner's death. The existence of a motive for both killings was substantial and undisputed.

There was also some evidence of planning activity. The curtains were drawn and the shades down when police entered the apartment. Donald McLaury, a neighbor, testified that this was unusual. The jury could reasonably have found that appellant had acted in this manner to conceal his crimes. Hence, the jury could find that appellant had taken some steps in preparation for the killings.

As for evidence related to the manner of killing, the victims in the present case were struck several times on the head with a heavy, blunt object. While this does tend to establish appellant's intent to kill, it does not necessarily establish that appellant killed "according to a 'preconceived design' to take his victim's life in a particular way . . . ." (*People* v. *Anderson, supra,* 70 Cal.2d at p. 27.) The evidence is equally consistent with a sudden impulse to kill.

Although there is not strong evidence of the third type mentioned in *Anderson,* there is sufficient evidence of types (1) and (2) to support premeditation and deliberation. A reasonable trier of fact could find that appellant premeditated and deliberated before killing his two victims.

Appellant further contends, however, that the jury could not have found premeditation, deliberation, or malice in light of the evidence of diminished capacity. This contention would require the jury and this court to accept without question all of the evidence most favorable to

appellant on this issue and to disregard the unfavorable. The law is to the contrary. (*People* v. *Johnson, supra*, 26 Cal.3d at pp. 576-577.)

For similar reasons, this court rejects the claim that the evidence establishes an inability to harbor malice because of mental disease or defect. Appellant offered no expert evidence in support of this claim. The only evidence which might tend to support such a finding was the testimony of his mother regarding a head injury while appellant was in high school and appellant's own statement to the police that he "went crazy." These items are insufficient to call into question the jury's finding that appellant was capable of harboring malice. (See *People* v. *Cruz* (1980) 26 Cal.3d 233, 245-251 [162 Cal.Rptr. 1, 605 P.2d 830].) "'The *sine qua non* of . . . a showing [of diminished capacity not due to intoxication] is that there be evidence of either mental illness or mental defect.'" (*Id.*, at p. 248, quoting from *People* v. *Berry* (1976) 18 Cal.3d 509, 517 [134 Cal.Rptr. 415, 556 P.2d 777].) In the present case, the evidence may have been sufficient to justify instructions on lesser included offenses. However, a full review of the record establishes that a trier of fact could reasonably reject this evidence and find beyond a reasonable doubt that appellant committed first degree murder.

## III.

■ Appellant next contends that the testimony of Dr. Lieberman was erroneously admitted because that testimony was based on statements made during Dr. Lieberman's examination of appellant to determine his mental competency. (See *Tarantino* v. *Superior Court, supra*, 48 Cal.App.3d 465, 469-470; *Estelle* v. *Smith, supra*, 451 U.S. 454.) In *Tarantino*, the Court of Appeal held that "neither the statements of [an accused] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of . . . guilt, under either the plea of not guilty or that of not guilty by reason of insanity." (*Id.*, at p. 470.) Acting under the impulsion of the privilege against self-incrimination, the court found such a "judicially declared immunity reasonably to be implied from the code provisions [§ 1367 et seq.]." (*Id.*, at p. 469.) *Tarantino* has been cited with approval by this court. (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193].)

Respondent urges that since Dr. Lieberman was initially appointed as a doctor to determine sanity (see §§ 1026, 1027), *Tarantino* does not apply and, alternatively, that *Tarantino* was wrongly decided.

Dr. Lieberman was initially appointed to examine appellant to determine whether he was sane at the time of the commission of the offenses. This appointment was prompted by appellant's entry of a plea of not guilty by reason of insanity. The statute regarding court-appointed psychiatric examinations following entry of a plea of not guilty by reason of insanity (§ 1027) contemplates testimony by these experts, and such testimony is admissible at the guilt phase if the defendant places his mental state in issue. (*In re Spencer* (1965) 63 Cal.2d 400, 412 [46 Cal.Rptr. 753, 406 P.2d 33].)

However, after his initial examination of appellant, Dr. Lieberman reported that he could not make a determination of appellant's sanity during the commission of the offenses, because appellant was so psychotic during the initial examination. Dr. Lieberman informed court and counsel that appellant was then mentally incompetent to stand trial. Defense counsel then requested initiation of section 1368 proceedings to determine appellant's mental competency. Although section 1369, subdivision (a) requires appointment of a psychiatrist when competency proceedings are commenced, the trial court did not appoint a different psychiatrist, indicating that doctors had already been appointed.[3]

When the formal section 1368 hearing began, Dr. Lieberman testified that appellant was incompetent. When Dr. Lieberman was confronted with information about appellant's mental state that had been developed between his examination and the hearing, he requested that the hearing be postponed and that he be permitted to reexamine appellant to see if there was any change in his condition regarding his mental competency to stand trial. It was at this reexamination that appellant told Dr. Lieberman the circumstances of the offense. This account by appellant was, in turn, the main foundation for Dr. Lieberman's conclusions, expressed in his guilt phase testimony, that appellant had the capacity to form the necessary mental states and that appellant had been feigning mental illness to avoid trial.

This series of events establishes that during the critical reexamination of appellant, Dr. Lieberman's inquiry was directed to appellant's mental competence to stand trial, despite the fact that he had been initially ap-

---

[3]*Tarantino* v. *Superior Court, supra*, 48 Cal.App.3d at page 470, stated that the immunity for an accused's statements to a psychiatrist examining for present mental competence "normally will require that the psychiatrists appointed for examination under section 1367 et seq. be other than those appointed for inquiry under section 1026."

pointed to examine appellant to determine whether he was sane during the commission of the offenses.

Thus, admission of Dr. Lieberman's testimony violated the rule of *Tarantino* that "neither the statements of [a defendant] to the psychiatrists appointed under section 1369 nor the fruits of such statements may be used in trial of the issue of [an individual's] guilt . . . ." (*Tarantino* v. *Superior Court, supra*, 48 Cal.App.3d at p. 470.) This rule is necessary to ensure that an accused is not convicted by use of his own statements made at a court-compelled examination. The rule also fosters honesty and lack of restraint on the accused's part at the examination and thus promotes accuracy in the psychiatric evaluation. Hence, the rule protects both an accused's privilege against self-incrimination and the public policy of not trying persons who are mentally incompetent.

Respondent claims that *Tarantino* was wrongly decided and should be disapproved, arguing that the immunity recognized in *Tarantino* is contrary to the Evidence Code sections defining the scope of the evidentiary privilege of psychotherapist-patient communications. (Evid. Code, §§ 1016, 1017.)[4] This argument misconceives the rationale for the immunity that was recognized in *Tarantino*.

The *Tarantino* decision did not find that statements made during a section 1368 examination were inadmissible due to the statutory privilege accorded confidential psychotherapist-patient communications. (See generally Evid. Code, §§ 1010-1015.) Rather, the basis for the *Tarantino* decision was the constitutional privilege against self-incrimination. "As to the right against self-incrimination, we find no violation in compelling a defendant to submit to examination by court-appointed psychiatrists under section 1367 et seq., at least under a judicially declared immunity reasonably to be implied from the code provisions." (*Tarantino* v. *Superior Court, supra*, 48 Cal.App.3d at p. 469.)

---

[4]Evidence Code section 1016 provides in pertinent part: "There is no privilege under this article as to a communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by: (a) The patient . . . ."

Evidence Code section 1017 provides: "There is no privilege under this article if the psychotherapist is appointed by order of a court to examine the patient, but this exception does not apply where the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information needed so that he may advise the defendant whether to enter or withdraw a plea based on insanity or to present a defense based on his mental or emotional condition."

Thus, the Evidence Code sections afford no guidance on this issue. Respondent's contention that *Tarantino* was wrongly decided is rejected.

Not only was the admission of the testimony of Dr. Lieberman a violation of state law, but as a recent United States Supreme Court decision establishes, it violated the federal Constitution as well. (*Estelle v. Smith, supra,* 451 U.S. 454.) In that case, the high court ruled that the Fifth Amendment privilege against self-incrimination is generally applicable to custodial mental competency examinations, and specifically discussed the provision of immunity for statements made during such examinations. (*Estelle v. Smith, supra,* 451 U.S. at pp. 466-469 [68 L.Ed.2d at pp. 371-373].) The court ruled that a state may not introduce at the penalty phase of a capital case, evidence of statements made by an accused at a custodial mental competency examination unless the accused has been informed of and has waived his *Miranda* rights.[5] In the absence of a valid waiver, the statements could only be used at the hearing on competency.[6] It is clear that appellant did not waive his rights prior to the session with Dr. Lieberman. ██ Thus, the admission of Dr. Lieberman's testimony was error under *Estelle v. Smith*[7] as well as *Tarantino*.[8]

---

[5]The court left open the possibility that the Fifth Amendment privilege might be waived where an accused introduces psychiatric testimony in his favor at the penalty phase. (*Estelle v. Smith, supra,* 451 U.S. at pp. 466, 472 [68 L.Ed.2d at pp. 371, 375].) It is noted that in the present case, appellant introduced no psychiatric testimony at either the guilt or penalty phase.

[6]The Supreme Court indicated that "[i]f, upon being adequately warned, respondent had indicated that he would not answer [the psychiatrist's] questions, the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose." (*Estelle v. Smith, supra,* 451 U.S. at p. 468 [68 L.Ed.2d at pp. 372-373].)

This would result in the peculiar situation that a possibly incompetent defendant, who has just been told he need not answer questions and has decided not to, would thereupon be informed that he was nevertheless required to submit to the questions of the court-appointed psychiatrist. The blanket immunity of *Tarantino* avoids such an anomaly in this state.

[7]The Supreme Court made clear that its rule would apply to the guilt phase as well as the penalty phase: "We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." (*Estelle v. Smith, supra,* 451 U.S. at pp. 462-463 [68 L.Ed.2d at p. 369], fn. omitted.)

[8]Appellant makes a related contention that the trial court erroneously admitted his statements to Dr. Wolff, a psychiatrist who interviewed appellant after he was picked up by police after the suicide attempt at Manhattan Beach pier. Appellant claims that the conversation was privileged under Evidence Code sections 1012 and 1014. He also

■ This court must now consider whether this error was prejudicial on the issues of premeditation and deliberation. The jury was properly instructed in accordance with CALJIC No. 8.20 (1979 Revision) that in order to return a verdict of first degree murder, it had to determine that appellant's intent to kill was "formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation .... [¶] [A] mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. [¶] To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, he decides to and does kill."

While it has already been observed that the evidence on the issues of premeditation and deliberation is sufficient to justify the jury's verdicts, that does not mean it compelled those verdicts. (See *People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824].) There is, as former Chief Justice Roger Traynor has observed, "a striking difference between appellate review to determine whether an error affected a judgment and the usual appellate review to determine whether there is substantial evidence to support a judgment." (Traynor, The Riddle of Harmless Error (1970) pp. 26-27.)

The evidence in this case certainly is open to the interpretation that the killings were committed in a sudden rage precluding mature and

contends that the conversation was inadmissible because it was not preceded by *Miranda* warnings or notification to counsel.

Respondent correctly points out that appellant's statements to Dr. Wolff were outside the scope of the psychotherapist-patient privilege. Evidence Code section 1016 establishes a "[p]atient-litigant exception" which states that the privilege does not apply to a communication relevant to an issue concerning the mental or emotional condition of the patient, if the issue has been tendered by the patient. As already noted, appellant had tendered the issue of his mental condition sufficiently to gain diminished capacity instructions. Appellant's communications to Dr. Wolff, in which he spoke of the killings in a manner that lacked delusional material and was generally coherent, were relevant to the issue of his mental condition at the time of the killings. Thus, the claim of privilege cannot be sustained.

Appellant's second contention regarding Dr. Wolff's testimony—lack of *Miranda* warnings or notification to counsel—also lacks merit. There was no objection on this ground in the trial court. But in any event, Dr. Wolff was not acting at the behest or on behalf of the state when he interviewed appellant, and appellant neither was in custody at the time nor was he the focus of any official suspicion. Neither of the cases cited by appellant is applicable to these facts. (See *In re Spencer, supra*, 63 Cal.2d 400; *Estelle* v. *Smith, supra*, 451 U.S. 454.) The requirements of notice to counsel and *Miranda* warnings do not apply to Dr. Wolff's interview.

meaningful reflection upon the gravity of the contemplated acts. (See *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959].) The manner in which the killings were carried out—primarily by assault with a kitchen skillet—does not suggest careful planning. Moreover, the steadily deteriorating nature of the relationship between Milner and appellant, as well as appellant's behavior after the assaults —his scrawling on the wall "I love you Marilyn," his increasingly serious suicide attempts, his repeated expressions of remorse, his feelings of "rage" as expressed in his statement to Detective Wren—all are reasonably consistent with killings committed upon a sudden emotional outburst. In this context, we must evaluate whether the errors below require reversal.

■ Since the admission of the testimony of Dr. Lieberman violated both state and federal standards (see *Tarantino* v. *Superior Court, supra*, 48 Cal.App.3d 465; *Estelle* v. *Smith, supra*, 451 U.S. 454), this court must assess the prejudicial impact of that error under the more rigorous test articulated in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

On the one hand, Dr. Lieberman's testimony was conceivably helpful to appellant, in that it graphically described his rage and frustration which led up to the murders. On the other hand, however, Dr. Lieberman summarized and analyzed a good deal of the prosecution case and his overall conclusions nailed down the issues of deliberation and premeditation, the key issues in the case. Indeed, at some points Dr. Lieberman's testimony reads more like the prosecutor's closing argument than ordinary expert psychiatric testimony.

In addition, his testimony enabled the prosecution to paint appellant as a malingerer and faker of mental incompetence, "clever" in tricking even professionals with respect to his mental state. Whether or not this was directly relevant to any of the key issues at the guilt phase, it could hardly have helped appellant on any close question.

On the question of prejudice, two points seem relevant. Since the admission of this testimony violated appellant's Fifth Amendment rights, the question of prejudice here must be judged under the federal test. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California, supra*, 386 U.S. at p. 24 [17 L.Ed.2d at pp. 710-711].)

██ Second, in this court's view the record reveals more evidence of "rage" than the dissent allows. Appellant stated in his confession that he "went crazy that night," explaining that his frustration was related not only to his general resentment of Milner's treatment of him but more specifically to multi-hour telephone calls that Milner was continually receiving from one of her boyfriends. The confession indicates appellant's belief that one such call, lasting from 10 p.m. to 1 a.m., occurred on the night of the murders, just shortly before the killings. While there was sufficient evidence from which the jury could have found premeditation and deliberation without Dr. Lieberman's testimony, given the version of the incident related in appellant's confession this court cannot say—particularly under *Chapman*'s "beyond a reasonable doubt" standard—that Dr. Lieberman's inadmissible testimony could not have tipped the scale in favor of findings of first degree, rather than second degree, murder.[9] The judgment must be reversed.

### IV.

This conclusion that reversal is required is reinforced by the additional errors committed below.

██ The prosecution asked Marilyn Milner's mother whether Milner had ever expressed fear of appellant. Defense counsel objected on hearsay grounds to the admission of any evidence of Milner's statements about appellant. The objections were overruled. Milner's mother then testified that Milner had told her shortly before her death that appellant was treating her "weird" by following her closely around the apartment. Milner expressed to her mother the fear that appellant "was going to hit her, to beat her up." Milner had also said she was planning to go to Washington the weekend after Memorial Day and had asked appellant to move out of the apartment by June 1.

The trial court ruled that this evidence, although hearsay, came within the state of mind exception to the hearsay rule, establishing declarant Milner's mental state of fear of the appellant. (See Evid. Code, § 1250.)[10] However, a statement of the declarant's then-existing mental

---

[9]Although appellant's frustration and rage was apparently directed only at Milner and not at Julie, the killings were obviously interrelated, and this court cannot assert as a matter of law that if such rage were present, it would only affect appellant's state of mind with respect to the killing of Milner.

[10]Evidence Code section 1250 provides:

"(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, mo-

state is admissible only if the declarant's state of mind is an issue in the case, or if the statement is relevant to prove or explain acts or conduct of the declarant. (See *People* v. *Ireland* (1969) 70 Cal.2d 522, 529 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

Respondent argues that Milner's statement was relevant for the second purpose, explaining her acts or conduct. The theory advanced is that Milner's fear of appellant, when coupled with physical evidence at the homicide scene which indicated a lack of struggle by her, could lead to an inference that appellant premeditated and deliberated the attack. This follows, it is argued, because "it would be reasonable to expect a person in Marilyn's position to be extra alert and extra apprehensive about what appellant might do, thus allowing the inference that appellant's success in attacking her by surprise occurred as a well thought out course of conduct ...."

A central problem with this argument is that there was no issue of fact raised by the defense with respect to Milner's conduct immediately preceding her death. Where a defendant has claimed that a victim has engaged in certain conduct which led to an accidental or justifiable homicide, then hearsay evidence of the victim's state of mind has been held admissible where such evidence tended to negate the claimed conduct of the victim. Thus, in *People* v. *Lew* (1968) 68 Cal.2d 774, 778-780 [69 Cal.Rptr. 102, 441 P.2d 942], state of mind evidence of the declarant's fear of the defendant was held to be relevant to disprove the defendant's claim that the declarant was sitting on his lap and examining his gun when it accidentally discharged.[11]

In the present case, appellant did not claim that his act of homicide was immediately preceded by any conduct by the hearsay declarant. Indeed, in his extrajudicial statements appellant had admitted committing the killings after Milner had gone to sleep. There was no issue raised by the defense as to any conduct by Milner immediately preceding her death which in any way provoked or mitigated the homicide.

---

tive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when:

"(1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or

"(2) The evidence is offered to prove or explain acts or conduct of the declarant.

"(b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

[11]Although *Lew* held this evidence to be relevant, it also held the evidence to be inadmissible on other grounds. (*People* v. *Lew, supra*, 68 Cal.2d at p. 780.)

The case is similar in this respect to *People* v. *Ireland, supra,* 70 Cal.2d 522. In *Ireland,* the trial court admitted a statement made by the victim to a friend on the morning of the day she was killed. The statement was that the victim was sure that the defendant, her husband, was going to kill her. This court held that the testimony of the friend about the statement was inadmissible hearsay, rejecting the argument, also made here, that the statement came within the state of mind hearsay exception. As in this case, the prosecution argued that this statement was admissible to explain the victim's conduct, and was therefore admissible pursuant to Evidence Code section 1250, subdivision (a)(2). This court rejected that claim stating: "The difficulty with this position is that the defense did not raise any issue of fact with respect to [the victim's] conduct immediately preceding her death. The undisputed prosecution evidence . . . established that [the victim] was reclining on a couch when she was shot by defendant. The defense did not dispute this fact . . . ." (*People* v. *Ireland, supra,* 70 Cal.2d at pp. 530-531, italics deleted.)

 In the present case, as in *Ireland,* the "acts or conduct of the declarant" (Evid. Code, § 1250, subd. (a)(2)) immediately preceding the homicide "were simply not in dispute." (*People* v. *Ireland, supra,* 70 Cal.2d at p. 532.)[12] The defense did not question prosecution evidence which indicated that Milner was lying on her bed at the time of the killing. Therefore, admission of the hearsay statements regarding Milner's fear of appellant and his "weird" actions was error.

 Milner's mother also testified regarding another statement made to her by Milner. According to this testimony, Milner told her mother that she (Milner) had ordered appellant to move out of her apartment "by the first of the month," i.e., by June 1. This testimony was clearly inadmissible because of subdivision (b) of section 1250, which forbids use of the state of mind exception for the admission of "evidence of a statement of memory or belief to prove the fact remembered or believed." As noted in the comment to section 1250 by the Assembly Committee on Judiciary, "[t]his limitation [in subdivision (b)

[12]The *Ireland* decision necessarily disposes of respondent's further contention that, by objecting at trial on the basis of hearsay rather than irrelevance, appellant failed to preserve the issue for appeal. The objection interposed by appellant was precisely the objection raised by the defendant in *Ireland.* (See 70 Cal.2d at p. 528.) When a hearsay objection is made to a statement sought to be admitted under the state of mind exception, that objection clearly notifies the trial court of the need to consider whether "the declarant's state of mind . . . is relevant to prove or explain acts or conduct of the declarant." (See *id.,* at p. 529.)

on the state of mind exception to the hearsay rule] is necessary to preserve the hearsay rule. Any statement of a past event is, of course, a statement of the declarant's then existing state of mind—his memory or belief—concerning the past event. If the evidence of that state of mind —the statement of memory—were admissible to show that the fact remembered or believed actually occurred, any statement narrating a past event would be, by a process of circuitous reasoning, admissible to prove that the event occurred."

This limitation on the admissibility of state of mind hearsay compels the conclusion that the trial court should have excluded the testimony concerning Milner's alleged order to appellant to vacate the apartment.

While the issue of prejudice has already been resolved under the *Chapman* test, the court notes that the statements concerning Milner's fear of appellant were similar to statements whose erroneous admission required reversal in *People* v. *Ireland, supra*, 70 Cal.2d at page 532.

There, the trial court had improperly admitted a statement by the victim that she feared harm from her husband (the defendant in the case). This court found the error to be prejudicial, reasoning that "[t]he statement in question not only reflected [the victim's] state of mind at the time of utterance; it also constituted an opinion on her part as to conduct which defendant would undertake at a future time. On the basis of this hearsay opinion the jury might reasonably have inferred that [the victim] several hours before the homicide had concluded that defendant had then formed the intention to kill her. The next logical inference, to wit, that [her] assessment of defendant's then intention was accurate and defendant had in fact formed an intention to kill several hours before the homicide . . . strikes directly at the heart of the defense. The judgment must, therefore, be reversed." (*Ibid.*)

■ While the statement that Milner feared appellant would "beat her up" may not be as prejudicial as the victim's statement in *Ireland* that the defendant would kill her, it was the only evidence of previous threatening behavior by appellant which might have suggested premeditation or deliberation.[13] Moreover, unlike *Ireland*, the erroneous

---

[13]The physical evidence as to the drawn shades and the severed telephone cord was ambiguous on this issue, as the prosecutor noted in her arguments to the jury. She observed that, as to the shade by Milner's bed, "there is a good possibility she pulled that blind herself." The other drawn shades, she twice indicated, were lowered "either before or after the killing[s]." She also stated that the breaking of the door bell and the cutting of the telephone cable occurred "probably after the killing[s]."

admission of the victim's statements of fear in the present case was compounded by the prosecutor's exploitation during final argument of the improperly admitted testimony that Milner had ordered appellant to leave her apartment by the first of the month.

In order to show premeditation and deliberation in her final arguments, the prosecutor relied most heavily on (1) the evidence that the night of the killings was to be the last night appellant would be allowed to stay at the apartment and hence was "the very last opportunity ... where he could kill her," and (2) appellant's statement to Detective Wren that he had killed Julie Blessing first because "if she finds out what's going on, I know she can run out of the house and call the police." However, proof of the former argument—that the very night of the killings was to be appellant's last night in the apartment—came directly from the inadmissible testimony of Milner's mother. Moreover, it was a theme to which the prosecutor repeatedly returned. Thus, she argued that the dispute between Milner and appellant, which appellant had mentioned to Detective Wren following his arrest, was caused by the "ultimatum" which Milner had given him.

Later, the prosecutor returned to this topic. "The fighting was the ultimatum that she [Milner] had given him. And when was he supposed to have gotten out? June 1st. He killed her after midnight of June 1st, sometime after 1 o'clock in the morning on June the 2nd. But that night, I suggest to you, ... he was supposed to have been gone by that day, and he wasn't. His clothes were still in that closet and he had not moved out.... [The] evidence shows that she was not accepting any money from Arcega for the June rent and that's why she gave him a June 1st ultimatum to get out and he did not get out and they had a fight about it. And so that would be the last time, the very last opportunity, that he would ever be with Marilyn under circumstances where he could kill her."

Still later, the prosecutor continued. "But I just feel that the evidence is so overwhelming that the defendant planned to do it. Sometime that night he formed the idea that he do it because his time was up, he knew he had to be leaving, he had the motive to kill, the reasons were different for killing each of the two girls.... [H]e knew that he had to kill Marilyn that night. He couldn't wait until the next day until Julie left the house and then kill Marilyn, sneak up behind her, while Julie was gone, because the fair inference is that the deadline was June the 1st and he's not out by June 1st and they have a fight and then he kills her

several hours later, after she'd gone to sleep. And a fair inference is that he planned to kill her that night and for those reasons."

These additional errors reinforce the conclusion under the *Chapman* test that appellant's convictions must be set aside and the cause remanded for retrial or other appropriate proceedings.

The judgment of the superior court is reversed.

Newman, J., Kaus, J., Broussard, J., and Reynoso, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

As the majority must acknowledge, there was overwhelming evidence of defendant's guilt of premeditated first degree murder. Nonetheless, the majority reverses his murder conviction, relying upon supposed "errors" which, in my view, could not possibly have affected the jury's verdict. Such a ruling directly contravenes the constitutional mandate which, it bears repeating, forbids reversal of a judgment in the absence of a "miscarriage of justice." (Cal. Const., art. VI, § 13.) No such miscarriage of justice occurred here.

The evidence of defendant's guilt was indeed overwhelming. He confessed to having murdered Marilyn Milner and Leila Blessing by repeatedly striking them on the head with a cast iron frying pan. Defendant first killed Blessing, in order to prevent her from interfering with his intended murder of Milner. Blessing suffered 10 to 12 blows to the head; Milner was struck on the head at least 5 times with "considerable force" and also was stabbed repeatedly in the back. Defendant confessed his crimes to two nurses, to a hospital psychiatrist, and to various police officers. He also confessed to Dr. Lieberman, a psychiatrist who was appointed to investigate his sanity.

In reversing defendant's murder conviction, the majority focuses on two alleged evidentiary errors. In light of the exceedingly strong evidence of defendant's guilt, neither error justifies a reversal.

1.) *Mrs. Baergen's Testimony*

The victim Milner's mother was permitted to testify that her daughter told her that defendant was acting "weird" and was following her around, that she feared he might hit her and "beat her up," and that she had ordered defendant to move out of the apartment occupied by

Milner and defendant by June 1. The foregoing testimony was inadmissible hearsay. It was also unquestionably harmless.

The majority concludes that the admission of Mrs. Baergen's testimony was reversible, prejudicial error because that testimony represented "the only evidence of previous threatening behavior by appellant which might have suggested premeditation or deliberation." (*Ante,* p. 529, fn. omitted.) The majority further speculates that testimony regarding the victim's June 1 "ultimatum" to defendant may have constituted further improper evidence of defendant's premeditation. Yet, the majority overlooks the following conclusive *and uncontradicted* evidence of premeditation which was properly admitted (primarily through defendant's own lengthy confession to police officers): Defendant, over a period of time, had become infatuated with victim Milner who nonetheless spurned him, engaging in sex with several other men while treating defendant (in the words of Milner's brother) as a "sugar daddy" by accepting his money without providing sexual favors in return. Defendant's infatuation thereafter turned to jealousy and frustration. According to defendant, Milner was "always telling me she's going to throw me out of the apartment," and that "she says she doesn't like me anymore."

On the night of the murders, defendant (admittedly "frustrated" by Milner's lengthy telephone conversation with one of her paramours) first killed victim Blessing for no other reason than to prevent her from finding out "what's going on" and to keep her from calling the police. Next, defendant brutally and methodically struck and viciously stabbed Milner to death. Under such circumstances, disclosing a long period of frustration and resentment by defendant, how could any reasonable juror fail to conclude that these murders were premeditated? Disregarding entirely Mrs. Baergen's testimony, there was ample confirmation of the premeditation.

The majority insists, however, that "The evidence in this case certainly is open to the interpretation that the killings were committed in a sudden rage . . . ." (*Ante,* p. 524.) With due respect, I suggest that the evidence fails to support any such fanciful speculation. Defendant expressed no "rage," malice or ill will whatever toward his first victim, Julie Blessing; as defendant's own confession makes clear, her murder was coldly and deliberately plotted to facilitate the planned and premeditated murder of victim Milner, and to eliminate Blessing as a witness. It is clear, of course, that defendant harbored resentment and malice aforethought toward Milner, but to say that such malice manifested it-

self in the form of an *unpremeditated* "sudden rage" is wholly unsupported by this record.

It is urged that reversal is required by our holding in *People v. Ireland* (1969) 70 Cal.2d 522, 532 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], but that case is clearly distinguishable. There, the trial court improperly admitted a hearsay statement of the murder victim to a friend to the effect that "I know [defendant] is going *to kill me.*" (Italics added, 70 Cal.2d at p. 528.) We quite correctly ruled that this decisive testimony was prejudicial, enabling the jury to find premeditation and striking "at the heart of the defense." (P. 532.)

In contrast to *Ireland*, the victim Milner's statement to her mother that she feared defendant might hit her or "beat her up" was considerably milder and added nothing of substance to the prosecution's overwhelming evidence of premeditation. Defendant's premeditated and deliberate murder of Milner was conclusively established by his own uncontradicted admission that he first killed victim Blessing because he was afraid she would stop him *from killing Milner.* Thus, defendant's prior intention to kill Milner was amply demonstrated by his own confession, and any evidence of Milner's earlier subjective fear of harm was wholly cumulative and harmless. As we explained in *People v. Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942], quoting from earlier cases, premeditation and deliberation involve a "preexisting reflection," and a "deliberate judgment or plan" which is "carried on cooly [*sic*] and steadily, [especially] according to a preconceived design." Defendant's planning activities on the night of the murder amply fulfilled those standards.

### 2.) *Dr. Lieberman's Testimony*

Dr. Lieberman, a psychiatrist, was permitted to testify that, in his opinion, based on personal interviews, defendant had been feigning mental illness to avoid trial, and that defendant was a "clever" and manipulative person, capable of deceiving professionals regarding his mental state. This testimony was inadmissible under *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 470 [122 Cal.Rptr. 61], which prohibits the testimonial use of statements made by an accused at a court-ordered competency hearing. The testimony was also harmless beyond a reasonable doubt.

The majority fails satisfactorily to explain how the admission of Dr. Lieberman's version possibly could have prejudiced defendant. Al-

though this evidence bore upon defendant's diminished capacity defense, the record discloses that this defense was extremely weak, because of defendant's own admissions, the lack of any supporting expert testimony, and very substantial evidence to the contrary. Thus, once again, the majority is compelled to focus on the elements of premeditation and deliberation, speculating that defendant may have killed "in a sudden rage precluding mature and meaningful reflection . . . ." (*Ante*, p. 524.) As I have explained, the record simply does not support such a theory. Moreover, because I do not understand how evidence of defendant's "cleverness" in feigning mental illness following his arrest could in any sense have helped the People to establish the elements of premeditation and deliberation, I conclude that Dr. Lieberman's opinions in this regard could not have possibly affected the verdict in this case.

The majority, characterizing the admission of Dr. Lieberman's opinions as federal constitutional error (see *Estelle v. Smith* (1981) 451 U.S. 454 [68 L.Ed.2d 359, 101 S.Ct. 1866]), states that the "federal test" of harmless error must be applied. (*Ante*, p. 525.) But even federal constitutional error may be deemed harmless where the evidence of defendant's guilt is "overwhelming." (*Harrington v. California* (1969) 395 U.S. 250, 254 [23 L.Ed.2d 284, 287, 89 S.Ct. 1726].) As expressed by the high court in a recent case applying the *Harrington* rule, "'[A] defendant is entitled to a fair trial but not a perfect one,' *for there are no perfect trials* [citations]." (*Brown v. United States* (1973) 411 U.S. 223, 231 [36 L.Ed.2d 208, 215, 93 S.Ct. 1565], italics added.)

The record reflects that defendant both planned and committed multiple murders. He was properly tried and convicted by an impartial judge and by conscientious jurors who gave him a fair trial. The asserted errors were nonprejudicial. There was no miscarriage of justice. We should no longer frustrate the enforcement of the penalty which the law has imposed.

I would affirm the judgment.

Mosk, J., concurred.