Filed 9/29/20  P. v. Barragan CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAFAEL BARRAGAN,<br><br>Defendant and Appellant. | B299822<br><br>(Los Angeles County<br>Super. Ct. No. MA071585) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Charles A. Chung, Judge.  Affirmed as modified.

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jaime L. Fuster and Joseph P. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following trial, a jury convicted defendant and appellant Rafael Barragan of one count of murder (Pen. Code, § 187),[1] involving the personal use of a deadly weapon, a knife, in violation of section 12022, subdivision (b)(1).  The jury also convicted defendant of dissuading a witness by personally using force or a threat of violence, in violation of section 136.1.

The trial court sentenced defendant to 25 years to life in state prison for murder, plus one year for the personal use enhancement.  It also imposed, but stayed, a four-year upper term for dissuading a witness.  And, the trial court imposed various fines and assessments.

Defendant timely appealed.  He argues:  (1) The jury's finding of premeditation and deliberation is not supported by substantial evidence; (2) Trial counsel was ineffective for failing to request CALJIC No. 8.73; (3) Substantial evidence does not support defendant's conviction for dissuading the victim from reporting a crime by force or threat; (4) The trial court erred in imposing various fines and assessments without first determining whether he had the ability to pay them; (5) In the event the matter is not remanded for an ability to pay hearing, the abstract of judgment should be corrected to reflect the fees orally imposed and as set forth in the trial court's minute order; and (6) The jury was incorrectly instructed with a modified version of CALCRIM No. 3426, which precluded the jury from considering evidence of voluntary intoxication.

The judgment is affirmed.  That said, we modify the trial court's oral pronouncement of judgment to impose a $40 court operations assessment (§ 1465.8) and a $30 court criminal conviction assessment (Gov. Code, § 70303) as to each count, as correctly reflected in the abstract of judgment.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

# FACTUAL BACKGROUND

## I. *Prosecution evidence*

On July 1, 2017, defendant's cousin's daughter had a quinceañera party in Lancaster. Defendant, Katrina Barragan[2] (Katrina), his 37-year-old wife of 11 years, and Amira Barragan (Amira), their nine-year-old daughter, went to the party after dropping off their six-year-old son, Cruz Barragan (Cruz), at his grandparents' house for the night. At the party, they sat at a table with defendant's older brother's family. Defendant brought beer to the table; Amira saw him carry four to eight cans at a time, although she only saw him drinking one beer and did not know what happened to all the beer he brought to the table or whether he offered it to anybody else sitting at the table. Amira estimated that defendant drank "20 or 19" beers, but admitted that she did not know how many beers he actually drank. At the party, Amira did not see defendant walk funny, stumble, yell, or fall.

Defendant and Katrina danced together at the party.

At some point, defendant suddenly grabbed Katrina's hand and left the party, and Amira followed. Defendant seemed angry, and he argued a bit with Katrina. When they got to defendant's truck, Katrina got in the driver's seat and told defendant that he could not drive because he was drunk. Defendant became angry and threw his vest on the ground. He then picked up his vest and got in the truck on the passenger side, after Katrina drove to where he was. Defendant and Katrina argued about how Katrina had left him "on the stupid dance floor." Katrina said that they should not be arguing in front of Amira, but defendant said that he did not care.

---

[2] Because the family members share the same last name, we refer to them by their first names. No disrespect is intended.

When they arrived home, Katrina told Amira to hide defendant's phone and keys. Amira put the phone in Katrina's purse and the keys in her own desk. Katrina and Amira went upstairs to change into their pajamas and to sleep in Cruz's room, while defendant put a shirt and shoes on. Right when Katrina and Amira were about to go to sleep, defendant came into the room looking angry and asked where his keys were. Katrina sent Amira to her own room, and defendant and Katrina went to the kitchen and started arguing. From her room, Amira heard Katrina saying, "You are the one who wants a divorce." Katrina came upstairs, and Amira started crying. Amira told Katrina that she was crying because she had heard Katrina saying that defendant wanted a divorce. Katrina said, "No, that's not true," and went back downstairs.

A few minutes later, Amira heard her mother scream and ran to the top of the stairs. Katrina yelled, "Amira, call 911." Amira was unable to see what was happening because someone had turned off all the lights. Defendant said, "Amira, do not listen to her." Amira went back to her room, began walking around inside her room, sat down on her bed, and then heard silence. At some point, she came out of her room, started walking down the stairs, and saw blood everywhere. Katrina lay by the "foot sitter" in the living room with blood all over the floor, and defendant was covered "a little bit" with blood. Katrina was not moving, and defendant was in front of her, saying angrily, "Katrina, this is rage." Amira saw a knife on the foot sitter. Defendant told Amira to go back upstairs, so she went into her room and barricaded her door out of fear that defendant would kill her. Amira thought to herself, "What the hell?" because she did not know what was going on.

It was stipulated that on July 1, 2017, at 11:46 p.m., Katrina called 911 from her home phone. During the call,

Katrina said, "I need the cops here; I think my husband is going to stab me." Katrina gave the dispatcher her home address and mentioned that her daughter was also there. Defendant asked if Katrina had called the police, and Katrina initially said, "Yes!" While crying, Katrina said, "Better stop, Ralph!" and "Don't!" Defendant then said, "Put that away! Did you call them?" Katrina responded, "No, I didn't!" The call was then disconnected.

Los Angeles County Sheriff's Deputy Alberto Rodriguez responded to the 911 call and arrived at 11:54 p.m. As the deputy arrived, defendant walked out the front door with his hands up. Deputy Rodriguez ordered defendant to turn around, and he complied. Defendant did not stumble or have any coordination problems. Defendant had a lot of blood on his face and head. When Deputy Rodriguez asked defendant if it was his blood and whether he needed medical attention, defendant replied, "'No. It's hers. She asked for it,'" in an angry, demeaning tone. Defendant's speech was not slurred in any way, and he responded quickly.

According to Los Angeles County Sheriff's Deputy Joseph Sexton, when he asked defendant whose blood was on him, defendant replied, "It's her blood." When asked to whom defendant was referring, defendant said, "'It's my wife's blood.'" Deputy Sexton asked defendant what he had done to her, and defendant responded that he "'did what she wanted me to do.'"

Deputy Rodriguez handcuffed defendant and put him in the back seat of the patrol car; he then asked defendant if he needed medical attention. Defendant responded, "'No. F*** you. F*** all of you.'" Deputy Rodriguez, who had been trained to conduct driving under the influence (DUI) investigations, did not smell any alcohol on defendant's breath. Defendant did not slur his speech, stumble or have difficulty walking, and he immediately

5

obeyed commands and was cooperative. Defendant appeared angry, but also acted "like nothing just happened" and was "very coherent." Similarly, Deputy Sexton did not observe defendant to be exhibiting any signs of being under the influence of alcohol. Deputy Rodriguez later saw Amira walking out of the front door holding a stuffed animal.

When Deputy Sexton entered the house, he saw Katrina lying in the living room on her back in a pool of blood with a large laceration to her inner left leg. Katrina had no pulse and felt cold. Deputy Sexton applied a tourniquet to Katrina's left leg, but then was immediately relieved by the Los Angeles County Fire Department. Amira was removed from the house during a protective sweep, and she appeared to be in shock.

Deputy Sexton transported defendant to the booking station; during the 15-minute drive, defendant did not smell of alcohol, did not vomit or pass out in the car, and did not exhibit any signs of intoxication. Defendant answered all the booking questions and followed all instructions when he was fingerprinted. He was compliant and cooperative, and had no problems signing forms. Defendant did not appear to be under the influence of alcohol.

Deputies recovered a knife near the fireplace in the same area where Katrina lay, a bloody Buck knife with a 4.7-inch long blade. The bloodstained home phone was next to the knife on a table, and the receiver of the phone was off the base. A black empty Buck knife sheath was recovered from the top dresser drawer "inside of the male closets." The dresser drawer was open, and next to it was what appeared to be a firearm.

The cause of Katrina's death was multiple stab wounds—24 in total, including 14 stab wounds and 10 incise wounds. Three of the stab wounds were fatal in and of themselves, including one that entered the right breast, fractured the fifth rib, and went

through the right lower lung, diaphragm, and liver.  Another entered the left breast and then the heart.  And one entered her right kidney and liver.

When a forensic identification specialist took photographs of defendant at about 4:00 a.m. on July 2, 2017, defendant immediately complied with the orders given to him and had no difficulty when asked to turn for each photograph.  The examiner did not smell any alcohol on defendant when taking the photographs.  A senior criminalist examined defendant for injuries.  She also swabbed defendant's nose and chest, where she observed bloodstains, and came within 12 inches of him.  She did not smell any alcohol on defendant, and when he was ordered to turn his hands upside down, he complied promptly.  Defendant also complied with orders to put his feet up one by one, and did not sway in any way.

II.  *Defense evidence*

At the quinceañera party, defendant's niece and nephew sat at the same table with defendant's family.  They saw him make three to five trips for beer, bringing back three cans each time.  Defendant drank about seven to nine cans of beer while they were there.

According to forensic toxicologist Dr. Rody Predescu, a person who drank 19 to 20 cans of beer in four hours would have a blood alcohol content (BAC) of at least .4 percent.  If a person consumed eight to nine beers in four hours, that person would have a BAC of about .14 to .15 percent.  Even though some people have a higher tolerance for alcohol, their brains are still affected by it even if they do not exhibit such classic symptoms as slurred speech and stumbling.

A person with a BAC of .4 percent would be in a stupor or coma; a person with a BAC of .3 percent would go in and out of consciousness, be emotionally unstable, and have exaggerated

7

emotions and loss of critical judgment. Under this level of intoxication, a person's perception, memory, comprehension, and cognition would be impaired and accompanied by severe confusion and unexpected behavior. The person could go into a rage if provoked. A BAC of .2 percent is pretty close to a BAC of .3 percent; the brain would be affected. A person with a BAC of .1 percent may have problems with coordination and be emotional, but not at the level of someone with a higher BAC.

A person with a BAC of .3 to .38 percent would smell strongly of alcohol and would not be able to follow commands promptly or walk straight. If a person had seven to eight beers in four hours, his BAC would be around .11 to .13 percent 90 minutes later. If a person had three to four beers in four hours, his BAC would be .03 to .05 percent, or nearly normal, 90 minutes later. A person with a BAC of .03 to .05 percent would not be so impaired as to go into an alcohol-induced rage. But a person with a BAC of .16 percent might easily experience an alcohol-induced rage. Though intoxicated persons may not intend to do so, they could hurt themselves or others. Whether a person with a BAC of .16 percent knew what he was actually doing depended on that person's level of rage and how much he had been provoked.

## DISCUSSION

I. *Substantial evidence of premeditation and deliberation supports defendant's first degree murder conviction*

Relying primarily upon evidence that he was drinking before he murdered Katrina, defendant contends that the jury's finding of premeditation and deliberation was not supported by sufficient evidence.

A. <u>Standard of review</u>

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a

rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Jones* (1990) 51 Cal.3d 294, 314 (*Jones*).) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Because we begin with the presumption that the evidence was sufficient, it is the appellant who bears the burden of convincing the court otherwise. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1430.) Reversal on a substantial evidence ground is unwarranted unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

B. <u>Relevant law</u>

"'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.] "Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'" [Citation.]' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812.)

*People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) "discusses three types of evidence commonly shown in cases of

9

premeditated murder: planning activity, preexisting motive, and manner of killing. [Citation.] Drawing on these three categories of evidence, *Anderson* provided one framework for reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation. In so doing, *Anderson*'s goal 'was to aid reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.] But, as we have often observed, '*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' [Citations.]" (*People v. Solomon*, *supra*, 49 Cal.4th at p. 812.)

Regarding premeditation and deliberation, "The true test is not the duration of time as much as it is the extent of the reflection." (*People v. Thomas* (1945) 25 Cal.2d 880, 900; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1080; *People v. Mayfield* (1997) 14 Cal.4th 668, 767, overruled in part on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*People v. Thomas*, *supra*, at p. 900.) Thus, a killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse. (*Ibid*.)

C. <u>Analysis</u>

Ample evidence supports the jury's finding of deliberation and premeditation. Viewing the evidence in the light most favorable to the judgment, defendant's deliberate and conscious choice to kill Katrina is demonstrated by his threat to stab her during their argument, followed by him going upstairs and retrieving his Buck knife from the dresser, and then doing

10

exactly what he said he would do—stab her. Indeed, Katrina called 911, presumably while defendant was in the process of retrieving the knife, and asked for help because she thought defendant was going to stab her.

Notably, during the 911 call, Katrina twice warned defendant to stop, thereby giving him the chance to reflect on his actions. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1287 [the defendant had time to deliberate and premeditate during the time it took a witness to go from the door to the service window and to take and prepare the defendant's order].) Yet it appears that her call to 911 further motivated defendant to stab Katrina, either to prevent her from continuing her 911 call or to punish her for calling the police.

Urging us to reverse, defendant relies upon a postconviction victim impact statement and contends that the "undisputed facts" establish that he killed Katrina in a drunken rage. The appellate record shows otherwise. As set forth above, although defendant may have been drinking at the party, he was not drunk. Law enforcement arrived at the residence eight minutes after Katrina's 911 call, and neither Deputy Rodriguez nor Deputy Sexton, who observed and were in close contact with defendant, testified that defendant either smelled of alcohol or exhibited any signs of intoxication. In fact, as defendant seems to acknowledge, his behavior after the stabbing—going to the kitchen to wash his hands and then going upstairs to change or put clothes on, and then going outside the house with hands up when the police arrived—belies his claim that he was drunk at the time he killed Katrina.

Defendant also points to evidence that he was angry when he left the party because Katrina had left him on the dance floor, when she refused to let him drive home and when she refused to give him his keys so he could leave the house after they got home.

11

Yet after coming home, Amira testified that she and Katrina changed into their pajamas and were about to go to bed before defendant entered the room and asked for his keys. At this point, Katrina told Amira to go to her own room, and Katrina went downstairs to the kitchen, where she and defendant argued.

It was at around 11:46 p.m., about an hour after they had returned home, that Katrina called 911 and said that she needed the police to come because she thought defendant was going to stab her. Thus, sufficient time had lapsed from when he was angry at the party to when he made the decision to stab Katrina to establish premeditation and deliberation.

Relying upon the *Anderson* factors, defendant argues that there was insufficient evidence that he premeditated and deliberated killing his wife. Aside from the fact that the *Anderson* factors are not exclusive (*People v. Koontz, supra,* 27 Cal.4th at p. 1081; *People v. Brooks* (2017) 3 Cal.5th 1, 58–59), they tip in favor of the judgment of conviction here. First, there is evidence that defendant planned to kill Katrina. As defendant acknowledges, he threatened to stab her before he actually did so. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 668 [evidence of prior threats admissible to show the defendant's state of mind]; *People v. Lang* (1989) 49 Cal.3d 991, 1015–1016 [evidence of prior threats is relevant and admissible to prove intent to kill].) He then went upstairs and retrieved his Buck knife from a dresser drawer. (*People v. Wright* (1985) 39 Cal.3d 576, 593, fn. 5 [obtaining a deadly weapon in advance of a killing supports an inference of planning activity]; *People v. Wharton* (1991) 53 Cal.3d 522, 547 [evidence suggested that the defendant removed a hammer (the murder weapon) from his toolbox in advance for the purpose of killing the victim].)

Second, there is evidence of defendant's motive. Contrary to defendant's argument that "'being mad at someone' is not

substantial evidence of a motive to kill", a killing can be motivated by anger. (*People v. Arcega* (1982) 32 Cal.3d 504, 519; *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 99, 102.)

Third, the manner of killing shows that defendant intended to kill Katrina. He brutally stabbed her 24 times. (*People v. Harris, supra*, 43 Cal.4th at p. 1287; *People v. Pride* (1992) 3 Cal.4th 195, 247.) And the nature of at least three of the wounds—deep, plunging stab wounds placed in critical regions and with enough force to fracture a rib—suggests that they were intentionally inflicted upon Katrina, not made in a frenzy.

Finally, to the extent defendant contends that the jury improperly relied upon the prosecutor's closing argument, as opposed to the evidence presented, we are not convinced. We agree with defendant that the prosecutor's argument is not evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) But there is no indication that the jury relied on anything but admissible evidence when it reached its verdict.

II. *Trial counsel was not ineffective for failing to request CALJIC No. 8.73*

Defendant contends that his trial counsel was ineffective for failing to request CALJIC No. 8.73 on provocation, which reduces first degree murder to second degree murder.

A. Procedural background

The jury was instructed with the newer CALCRIM instructions, not the older CALJIC instructions. In particular, the jury was instructed with CALCRIM Nos. 500 (Homicide: General Principles), 520 (First or Second Degree Murder With Malice Aforethought), 521 (First Degree Murder), and 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense). The jury was also instructed on voluntary intoxication.

13

Defense counsel did not request CALJIC No. 8.73[3] or CALCRIM No. 522.[4]

B. Relevant law

Because CALJIC No. 8.73 and CALCRIM No. 522 are pinpoint instructions, defendant was obligated to request that one be given; the trial court did not have a sua sponte duty to give it. (*People v. Rogers* (2006) 39 Cal.4th 826, 878–879.) Thus, defendant argues that his trial counsel was ineffective for failing to request that one of these instructions be given.

To successfully assert a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's representations fell below an objective standard of reasonableness, and but for counsel's errors there is a reasonable probability that the result of the proceeding would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, overruled in

---

[3]     CALJIC No. 8.73 provided, in relevant part:  "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing of a human being, but the provocation was not sufficient to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation."

[4]     CALCRIM No. 522 provides, in relevant part:  "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter].  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]"

part on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 822–823.)

"'"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [Citations.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation]. "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.] [¶] In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]' [Citation]." (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

C. Analysis

1. *Habeas corpus*

As defendant points out, claims of ineffective assistance of counsel are often best litigated in a habeas corpus proceeding. Our Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citation.] 'We recommended in [*People v. Pope* (1979) 23 Cal.3d 412] that, "[t]o promote judicial economy in direct appeals where the record contains no explanation,

15

appellate counsel who wish to raise the issue of inadequate trial representation should join a verified petition for writ of habeas corpus.'" [Citations.]  Because claims of ineffective assistance are often more appropriately litigated in a habeas corpus proceeding, the rules generally prohibiting raising an issue on habeas corpus that was, or could have been raised on appeal [citations] would not bar an ineffective assistance claim on habeas corpus." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

According to defendant, his claim of ineffective assistance of counsel can be raised on appeal because there could be no satisfactory explanation for his trial counsel's failure to request either of these instructions.  For the reasons set forth below, we cannot agree.  It follows that we reject defendant's claim of ineffective assistance of counsel on the grounds that (1) this claim should have been brought in a habeas corpus proceeding, and (2) in any event, he did not receive ineffective assistance of counsel.

## 2. *No ineffective assistance of counsel*

Trial counsel appears to have had a rational, tactical reason for not requesting either CALCRIM No. 522 or CALJIC No. 8.73.  The jury was instructed on voluntary manslaughter with CALCRIM No. 570, which stated that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. Specifically, the instruction stated:  "The defendant killed someone because of a sudden quarrel or in the heat of passion if:  [¶]  1.  The defendant was provoked;  [¶]  2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his) reasoning or judgment;  [¶]  AND  [¶]  3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Based on this instruction, defense counsel argued that defendant was guilty of voluntary manslaughter, not murder. Contrary to what defendant claims, trial counsel did not acknowledge that Katrina's provocation of refusing to give defendant his car keys "may not have been the objectively reasonable provocation required for heat of passion/voluntary manslaughter." Rather, counsel argued that the jury should assess defendant's actions from the perspective of a person who had drank the same amount of alcohol as defendant had:

"Rage. Rage. We were told by the expert that, yes, people who are drunk can have rage. Nobody knows what ticks them off. Refusing to give a man's car keys is ridiculous to you and me. It is absolutely ridiculous but with somebody that is under the influence of alcohol and drunk, it may not be that ridiculous. They said, well, you have to look at what the average person did but did the average person dr[i]nk the same amount of alcohol that he did in that same situation? That's the thing that you have to look at. You have to look at the evidence. You have to look at what was said to us here."

In other words, rather than request CALJIC No. 8.73 or CALCRIM No. 522, which, if given, would have only directed the jury to consider whether provocation caused the murder to be first or second degree, i.e., whether it was premeditated or unpremeditated, trial counsel argued that defendant was only guilty of voluntary manslaughter. Defense counsel could have reasonably chosen not to request an instruction that presumed "the provocation was not sufficient to reduce the homicide to manslaughter," in light of the trial court's instructing with CALCRIM No. 570 that provocation could do so. This is especially true since the trial court also instructed on voluntary intoxication (CALCRIM No. 625), which trial counsel's defense

17

focused on, and which he argued negated intent to kill and/or premeditation and deliberation.

Therefore, no deficient performance has been shown.

### 3. *No prejudice*

Even if trial counsel had performed deficiently in failing to request either CALCRIM No. 522 or CALJIC No. 8.73, defendant was not prejudiced. By returning a verdict of first degree murder under properly given instructions, the jury necessarily rejected defendant's voluntary intoxication defense as well as the theory that he was provoked to act rashly and without premeditation and deliberation. In other words, the jury necessarily rejected defendant's theory of the events and resolved the factual question posed by the missing instruction adversely to him. (See *People v. Mincey* (1992) 2 Cal.4th 408, 438; see also *People v. Wharton*, *supra*, 53 Cal.3d at p. 572 ["By finding defendant was guilty of first degree murder, the jury necessarily found defendant premeditated and deliberated the killing. This state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion"].) Moreover, as set forth above, the evidence overwhelmingly supported the jury's verdict. Therefore, any error in failing to request CALJIC No. 8.73 or CALCRIM No. 522 was harmless because there is no reasonable probability that had the instruction been requested by defense counsel and given by the trial court, defendant would have been convicted of second degree murder.

### III. *Substantial evidence supports defendant's conviction for dissuading the victim from reporting a crime by force or threat of violence*

Defendant contends that his conviction for dissuading Katrina from reporting a crime by force or threat must be reversed because "[t]here was no evidence that [he] had the

18

specific intent to dissuade or prevent Katrina from reporting the volatile situation when he told her to put the phone down, or that he used force to stop her from calling the police."[5]

  A. <u>Relevant law and standard of review</u>

  Section 136.1 prohibits intimidation of witnesses or victims.[6]  Specifically, subdivision (a) prohibits "knowingly and maliciously" preventing or dissuading a witness from attending or giving testimony at any trial or other proceeding authorized by law, or attempting to dissuade a witness.  (§ 136.1, subds. (a)(1) & (a)(2).)  Subdivision (c)(1) is violated when a defendant does an act specified in subdivision (a) and "the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person."  (§ 136.1, subd. (c)(1).)  As used in section 136.1, "'[m]alice' means an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice."  (§ 136, subd. (1).)

  A threat need not actually deter or reach the witness because the offense is committed when the defendant makes the attempt to dissuade the witness.  Section 136.1, subdivision (d), provides:  "Every person attempting the commission of any act described in subdivisions (a), (b), and (c) is guilty of the offense attempted without regard to success or failure of the attempt.  The fact that no person was injured physically, or in fact

---

[5] We reach the merits of this argument even though defendant's sentence on this count was stayed pursuant to section 654.

[6] Defendant rightly points out that intimidation is not an element of the offense.  (*People v. Neely* (2004) 124 Cal.App.4th 1258, 1261, 1266.)

19

intimidated, shall be no defense against any prosecution under this section."

We review the conviction for substantial evidence. (See *Jones*, *supra*, 51 Cal.3d at p. 314.)

B. <u>Substantial evidence supports the jury's finding that defendant sought to prevent or dissuade Katrina from reporting him to the police</u>

Substantial evidence supports defendant's conviction. Here, the transcript of Katrina's 911 call shows that she called the police to request assistance because she thought that defendant was going to stab her. Therefore, at the point she made the call, defendant had already threatened her. Defendant then retrieved his knife, returned, and asked Katrina if she had called the police. She initially answered yes, while telling him to stop. Defendant asked a second time, which raised a reasonable inference that he did not believe Katrina's first answer or actually noticed the call. Either in response to defendant's increasing anger and/or his threatening behavior with the knife, she denied having called the police, and then the call was disconnected.

This evidence establishes that defendant menaced Katrina with the knife while asking her whether she had called the police, thereby using fear to attempt to dissuade her from continuing her ongoing conversation with the 911 operator or from further reporting defendant's conduct to law enforcement. (Cf. *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344, superseded in part by statute as stated in *People v. Franz* (2001) 88 Cal.App.4th 1426, 1442 [words or actions attempting to cause someone not to report a crime may show defendant attempted to dissuade them from making a report]; see also *People v. McElroy* (2005) 126 Cal.App.4th 874, 882 [intentionally blocking a victim's or a witness's access to a telephone can constitute an attempt to

20

prevent the victim or witness from making a police report for purposes of section 136.1].)

Urging us to reverse, defendant contends he did not stab Katrina to stop her from calling 911, and claims that the prosecutor argued "inconsistent theories" about the 911 call.  The prosecution did not have to prove that defendant stabbed Katrina to prevent her from talking to police or the 911 operator.  Instead, it was sufficient that defendant confronted Katrina in a menacing manner with a knife to dissuade her from calling police or completing her ongoing 911 call.

In any event, it was perfectly reasonable for the jury to infer that defendant had separate yet simultaneous intents or motives to stab Katrina; he had already planned to kill her out of anger and then was additionally motivated to do so to prevent her from completing her ongoing 911 call or from further reporting his conduct to police.  (Cf. *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 [multiple punishment not barred in a case where there are different yet simultaneous intents].)

Because appellant specifically intended to prevent Katrina from completing her 911 call by threatening and/or stabbing her with his knife, substantial evidence supports his conviction on count 2 for dissuading a victim from reporting a crime by force or fear.

IV.  *The trial court did not err in imposing a restitution fine and various assessments against defendant*

Defendant argues that pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), the trial court violated his constitutional rights by imposing various fines and assessments without first determining whether he had the ability to pay them. A growing number of courts of appeal have questioned the correctness of the newly announced constitutional principle enunciated in *Dueñas*, including this division, and the question is

21

now before the California Supreme Court.  (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 322 (*Hicks*), review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067–1069; *People v. Kopp* (2019) 38 Cal.App.5th 47, 81–83, review granted Nov. 13, 2019, S257844.)  In *Hicks*, we fully explained our reasoning that *Dueñas* was incorrectly decided and we stand by that analysis.

It follows that defendant did not receive ineffective assistance of counsel for failing to raise this issue at sentencing.

Alternatively, defendant argues that in the event the matter is not remanded for an ability to pay hearing, the abstract of judgment should be corrected to reflect the fees orally imposed at the sentencing hearing and as set forth in the trial court's minute order.  The People do not respond to this point in the respondent's brief.

Defendant is correct that ordinarily "[w]here there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls.  [Citations]." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)  This principle does not apply where the trial court did not orally pronounce the correct, statutorily mandated assessments.  (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483–484 [where the trial court failed to orally impose a $30 court facilities assessment or a $40 court security fee, the Court of Appeal modified the oral pronouncement of judgment to impose such fees as to each count].)

In the instant case, at the sentencing hearing, the trial court ordered defendant to pay a $40 court security fee and a $30 court facilities assessment.  That was error; the trial court should have ordered those fees to be imposed as to each count for which defendant was convicted, even if the sentence as to one of those counts was stayed.  (*People v. Sencion*, *supra*, 211 Cal.App.4th at

22

p. 484.) That said, the abstract of judgment correctly orders defendant to pay a court security fee of $80 and a criminal conviction assessment of $60 ($40 and $30 as to each count, respectively). Under these circumstances, we do not need to correct the abstract of judgment. Rather, we modify the oral pronouncement of judgment to impose a $40 court security fee (court operations assessment), pursuant to section 1465.8, and a $30 criminal conviction assessment, pursuant to Government Code 70303, as to each count, as correctly reflected in the abstract of judgment.

V. *Defendant was not prejudiced by the trial court's instruction of a modified version of CALCRIM No. 3426*

In a supplemental brief, defendant contends that the trial court incorrectly instructed the jury with a modified version of CALCRIM No. 3426, which precluded the jury from considering evidence of voluntary intoxication as to whether he acted with premeditation and deliberation.

A. <u>Procedural background</u>

Prior to closing arguments, the trial court indicated that the parties had discussed the jury instructions and agreed that murder and dissuading a witness were specific intent crimes, and that the lesser crimes as to the murder count were second degree murder and voluntary manslaughter based on heat of passion. The trial court indicated that it had given the attorneys jury instruction packets "that we discussed over the lunch hour." When asked if there were any instructions that he was objecting to, or whether there were any instructions the court was failing to give that he was requesting, defense counsel stated, "No, Your Honor." Defense counsel then asked whether "[t]hese things you just handed us, these are the additions?", to which the trial court responded, "Correct. Back in chambers I told you I would make

23

certain changes and I would get those to you and I have gone ahead and done that."

Accordingly, the trial court instructed the jury with CALCRIM No. 625, which allowed the jury to consider evidence of defendant's voluntary intoxication in deciding whether he acted with an intent to kill, acted with deliberation and premeditation, or intended to prevent a victim from reporting a crime. The jury was instructed on the definition of voluntary intoxication, and the instruction concluded by saying, "You may not consider evidence of voluntary intoxication for any other purpose."

The jury was separately instructed on voluntary intoxication with CALCRIM No. 3426, which gave the same definition of voluntary intoxication, but instructed the jury that it could consider such evidence "only in deciding whether the defendant acted with the intent to kill or the intent to prevent a victim from making a police report." (Emphasis omitted.) It further instructed the jury that "[i]n connection with the charge of murder, the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the intent to kill. [¶] If the People have not met this burden, you must find the defendant not guilty of murder and lesser crime thereto." (Emphasis omitted.)

B. Forfeiture

Even though he was given the opportunity to review the jury instructions and object and/or request any modifications or changes, defense counsel did not object to CALCRIM No. 3426. It follows that he has forfeited his current claim of error on appeal. (*People v. Battle* (2011) 198 Cal.App.4th 50, 64–65 ["'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The

24

question is whether the error resulted in a miscarriage of justice'"].)

   C. <u>There was no prejudicial error</u>

   For the sake of completeness, we will reach the merits of defendant's argument.

   Defendant is making a claim of conflicting or ambiguous jury instructions. When we review such a claim, the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. (*People v. Smithey* (1999) 20 Cal.4th 936, 963.) Jury instructions are not considered in isolation, but rather in the context of the entire charge and the arguments of the parties. (*People v. Young* (2005) 34 Cal.4th 1149, 1202; *People v. Smithey, supra,* at pp. 963–964.) In other words, we "review the instructions as a whole to determine whether it is 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.) Instructional error is reviewed de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

   Here, it is possible that the jury was confused by the apparent conflict between CALCRIM No. 625, which correctly instructed the jury that voluntary intoxication could be considered on the issues of whether defendant intended to kill and whether he deliberated and premediated, and CALCRIM No. 3426, which told the jury that voluntary intoxication could only be considered when deciding whether the defendant acted with the intent to kill or the intent to prevent a victim from making a police report.

   But, we need not decide whether the trial court erred because we find that any error was harmless under any applicable standard. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability standard for state law error]; *Chapman v.*

25

*California* (1967) 386 U.S. 18, 24 [stricter beyond-a-reasonable-doubt standard for federal constitutional error].)

There was ample evidence that defendant was not intoxicated at the time he brutally stabbed Katrina to death. The crime occurred over an hour after the family came home from the party. And, Katrina's 911 call indicates that defendant threatened to stab his wife, then went upstairs to retrieve his Buck knife before returning downstairs, asked Katrina whether she had called the police, and then stabbed her 24 times, despite her twice telling him to stop. Moreover, neither Deputy Rodriguez nor Deputy Sexton smelled alcohol on defendant or noticed that he was exhibiting signs of intoxication. In fact, defendant notes that his behavior after the stabbing—going to the kitchen to wash his hands, going upstairs to change or put clothes on, and then calmly going outside the house with his hands up when police arrived—belies his claim that he was drunk at the time he murdered his wife. Defendant even told police that Katrina had "'asked for it.'"

While defendant may have been drinking earlier at the party, he was not drunk to the point where he could not premeditate and deliberate the killing of his wife. Thus, the evidence contradicts defendant's claim that he was acting impulsively or irrationally as a result of alcohol intoxication when he stabbed Katrina.

In light of this overwhelming evidence, even if there had been instructional error, any error was harmless. (*People v. Collie* (1981) 30 Cal.3d 43, 62 [verdict of premeditation and deliberation entails a specific intent to kill and thus instructional error harmless].)

VI. *Cumulative error*

Finally, defendant contends that the cumulative effect of the errors in this case requires reversal of his murder conviction.

26

As set forth above, there were no prejudicial errors to accumulate.  A defendant is entitled to a fair trial, not a perfect one.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  He received one here.

## DISPOSITION

The oral pronouncement of judgment is modified to impose a $40 court operations assessment (§ 1465.8) and a $30 criminal conviction assessment (Gov. Code, § 70373) as to each count.  As modified, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST


We concur:



_____, P. J.
LUI



_____, J.
HOFFSTADT