Filed 6/29/21  P. v. Meier CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058845 |
| v. | (Super. Ct. No. 17WF1635) |
| MATTHEW PAUL MEIER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Lynne G. McGinnis and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

Matthew Paul Meier, the manager of Clancy's Bar in Seal Beach, punched James Tinsman. The blow knocked Tinsman unconscious and he fell backwards, fracturing his skull. He later died from the brain trauma. A jury convicted Meier of involuntary manslaughter (by the unlawful act of battery) and aggravated assault with force likely to produce great bodily injury (GBI). The court sentenced him to an eight-year prison term.

Meier raises the following issues on appeal: (1) there was insufficient evidence to support his convictions; (2) the court erred by instructing the jury on mutual combat (CALCRIM No. 3471); and (3) the court should have imposed sentence on the manslaughter conviction rather than a longer sentence for an enhanced aggravated assault. We conclude these contentions lack merit and affirm the judgment.

I

Kristoffer Campbell, a bartender at Clancy's Bar and Meier's friend, was working the evening of the incident. Campbell, who bartended at another bar, knew Tinsman as a customer, but it was his first time serving him at Clancy's. Campbell recalled Tinsman was intoxicated and being problematic, and he asked Tinsman to leave the bar several times. He stopped serving Tinsman drinks.

At approximately 1:03 a.m., Amelia Murphy and her friend, Ian Hampshire, were smoking cigarettes outside of the bar. Video surveillance footage showed they reentered the bar 10 minutes later, and Meier held the door open for them. Tinsman, highly intoxicated, was stumbling behind Murphy and Hampshire towards the door. Meier blocked Tinsman from re-entering the bar. At 1:14 a.m., Meier had his back turned towards Tinsman but then quickly spun around and punched his face. Tinsman fell backwards onto the ground outside the bar. Meier walked away from Tinsman and made his way through the bar. Whereas, Murphy attempted to help Tinsman and video surveillance showed Chris Wagner, who was inside the bar, rushed outside to help.

2

Wagner dialed 911 and reported Tinsman had been punched and was unconscious. When the 911 dispatcher asked for more details, Wagner stated Tinsman had "damage to his face" but he was breathing, and he had been rolled onto his side to prevent him from choking on his blood. Wagner passed the phone to Murphy, who told the dispatcher Tinsman was breathing but coughing up blood. When asked what happened, Murphy stated Tinsman "got hit in the face" and it was "by somebody at the bar." The dispatcher asked Murphy if she knew that person or could describe that person. Murphy replied, "No I do not know that person and I can't describe that person. He was mouthing off and got hit in the face. He's ok. He's sleeping because he drank too much, but he's bleeding out of his nose and he's coughing up blood."

The dispatcher asked Murphy to clarify who was mouthing off, and she stated, "Um, I'm an innocent bystander . . . ." When asked again, Murphy stated Tinsman was the one "mouthing off." Murphy said she did not have to answer any more questions but to send the paramedics. The dispatcher continued to ask Murphy questions about whether she saw the person who hit Tinsman. Murphy stated, "Yeah, they were ***annoyed with him. *** And he ran away." [1] She said the person who hit Tinsman was wearing "[a] black shirt and khaki shorts. Just like everybody else here."

When Officer Michael Pistilli arrived at the bar at 1:23 a.m., he saw Meier with two other people standing outside the front entrance. Pistilli drove to the rear parking lot, and saw Tinsman lying on the ground near two people. While Tinsman received help, Pistilli spoke with several bystanders.

Eventually, Pistilli asked Meier for the surveillance video. Meier had helped Pistilli obtain surveillance footage on other occasions. Pistilli stated Meier was

---

[1] Many of the investigating police officers were wearing voice recording devices on their uniforms. The jury reviewed written transcripts of these conversations, wherein the *** symbol denotes unintelligible speech. These transcripts contain typographical errors and the speakers do not always observe proper grammatical conventions. We quote from the written transcripts without correction.

highly intoxicated but agreed to help. At the time, Pistilli was wearing a voice recording device on his uniform, and he taped his interaction with Meier. Pistilli recalled Meier attempted to be cooperative, but as they started watching the security footage he was having a hard time focusing and became upset and angry. Pistilli saw the security footage stopped for the time period Tinsman was injured. Meier claimed the video "jumped" and Meier appeared unable to operate the system. Pistilli asked a bartender and Meier's girlfriend to contact Meier's father (the bar's owner) to help operate the security cameras. In the end, Pistilli was unable to obtain the video footage that night.

Officer David Barr, who arrived at the bar after Pistilli, spoke with Meier in the back parking lot near where Tinsman was laying on the ground. Barr was wearing a voice recording device and taped his conversation with Meier. Barr told Meier they needed to figure out what happened because if the victim were to die there would likely be a lawsuit involving the bar. Meier responded with expletives and unintelligible words. Barr stated he would really like a copy of the video to clear up whether Tinsman fell or was punched in the face. He told Tinsman, "we're going to have your dad come down here and pull the video up so that we can look at it. Okay. So do me a favor, sit down in there and hang tight till we get going. Okay?" He later added, "Okay? Do me a favor, go have a seat, just cool your jets right there . . . that guy." Barr stated Meier was acting like someone under the influence of alcohol. He recalled it struck him as odd that after saying the victim may die and sue the bar, Meier seemed very "nonchalant about it." He explained it was surprising because he knew Meier, having dealt with him on numerous prior occasions, was not so intoxicated to have not understood the importance of looking at the video surveillance.

Approximately a half hour later, Barr overheard Meier tell a different officer that Tinsman had been bothering him. Barr also heard Meier say he had been in the parking lot with Tinsman smoking, and then headed back inside the building.

4

Barr also interviewed Murphy, who indicated she was friends with Tinsman and she attempted to catch his head or neck before he hit the ground. She asked for someone to call the paramedics because she saw Tinsman was coughing up blood. Barr recalled Murphy offered several different stories about what transpired, ranging from not seeing anything to Tinsman hitting his head on the door or being punched. Barr brought Meier outside and asked Murphy if he was the person who hit Tinsman. "She said, 'yeah,' and then she said, 'No because the guy had his hat on backwards.'" At that moment, Meier was not wearing a hat backwards.

Firefighter paramedic Kevin Kron treated Tinsman, who was not responsive. He recalled a woman approached him and said "something to the effect that he hit him, but it was a nice hit." Kron transported Tinsman to the hospital.

Sergeant Chris Hendrix arrived on the scene at approximately 1:23 a.m. He had known Meier for 12 years, and referred to him by his nickname "Mattie." He entered the room where Pistilli and Meier were looking at surveillance videos. He said Meier appeared to be intoxicated and was not responsive to Pistilli's request to review the video. Hendrix asked Meier if he was involved in a fight and to be truthful because other officers had identified him as potentially being part of a fight with the victim. Meier responded, "'No, Man. I wasn't even out there.'" When Hendrix told Meier that someone outside said he was involved, Meier exclaimed, "'That's bullshit. I wasn't even out there.'"

Officer Jorge Muniz and his partner Detective Fisher interviewed Meier the following day and they recorded the conversation. Meier stated he and Tinsman were acquaintances and he was an occasional customer of the bar. Meier did not like working when Tinsman was there. He explained, "I don't know if there's something wrong with him or if he has a disorder, but he like rubs a lot of people the wrong way. Like after a beer or two, he's just out of his mind fucked up."

Meier added that they were all hanging out and intoxicated. He stated, "Dude, I was shit-canned out of my mind. I don't remember. The only thing about [Tinsman] that I remember is that I was like, 'Hey man, Kris said he's not going to serve you anymore, like probably close out or whatever." After telling Tinsman that he was cut off from being served more alcohol, Meier recalled Tinsman was not really upset and said "'Ah, c'mon, [Meier].'" He said Tinsman did not say anything serious or "get in [his] face" about it. Meier said the next thing he remembered was the police arriving.

Meier confirmed he and Wagner reviewed video surveillance footage together. Meier said he watched how he helped push Hampshire, who was sitting in a wheelchair, through the back door and that Tinsman was behind them. Meier claimed the video glitched and the next thing visible was Tinsman on the ground. Meier said he and Wagner both did a "double take" and Meier thought "'what the fuck?'" Meier told the officers he remembered Wagner rushed outside and called 911 immediately.

Meier told the officers about an altercation earlier that evening regarding people in the Navy and said the night was exhausting. He stated, "And, I mean that's all I freaking remember. Like I mean I don't know if I hit him or he fell. I mean, really, I have no fucking idea."

Muniz asked Meier if there was a reason Tinsman would attack him. Meier replied, "No, but he's just like, he's weird. Like, he says dumb shit to people. Like he's almost got himself into like several fights, that's why I was saying like I don't, really he doesn't come in on my shifts because I just end up throwing him out. Or if he's with like a couple of people, his sister, his brother, or something, like I'll let him have like one beer. And just kinda ignore him enough to where he's not like welcome. You know what I mean, kind of?" Meier said he tried to keep things amicable between them, and he would occasionally engage in "small talk about the Chargers." Meier said he did not "dislike" Tinsman and he could not remember anything different about him that night.

Muniz told Meier that he understood the details were blurry and Meier could not remember hitting Tinsman, but asked if he could remember if his hands were sore the next day. Meier admitted his hands were a little sore but added he "jammed" his fingers "the other day" playing football. He also mentioned hitting or slamming a barstool. Specifically, he said, "And I know, Kris was like, 'you know you came in and punched the, er punched, er slammed the barstool down?"

Muniz stated he knew Meier had been in fights before and asked him to recall how sometimes the day after a fight your knuckles are swollen or scratched. He asked, "Did you have like any of that? That would indicate like, 'Hey, what did I get into last night?'" Meier replied, "Yeah but I – I guess I ate shit the entire way back to Bill's house, after the whole call . . . ." He added, "So like my knees are all scraped up" and "[l]ike my ribs are killing me . . . ." Muniz said, "what you're saying is that you're liver was working really hard." Meier responded he and his girlfriend were not sure how they got "that wasted" on the night of the incident.

In the hospital emergency room, physicians determined Tinsman was brain dead. A forensic pathologist performed an autopsy and recorded the following injuries. Externally, Tinsman's upper lip had a one-half by one-half-inch laceration and the tissue inside his mouth suffered bruising and bleeding. The pathologist explained "laceration" is a medical term for a blunt force injury, which differs from a "penetrating injury" created by gunshot or stab wounds. In addition, the pathologist noticed injury to Tinsman's frenulum (the web of tissue that connects the upper portion of the middle teeth to the upper lip). The pathologist described a photograph showing Tinsman's split lip, and said the injury was caused by an impact with a non-specific object because there was no pattern on the laceration. The injury "indicated force was applied to that area to cause a tearing of the upper lip." On the photograph, Tinsman's tooth was visible through the gap created by the split lip. The back of Tinsman's skull showed subgaleal hemorrhaging

7

and had several fractures.  The pathologist determined Tinsman died due to blunt force head trauma.

The information charged Meier with involuntary manslaughter by an unlawful act - battery (Pen. Code, § 192, subd. (b), count 1)[2] and assault with force likely to produce GBI (§ 245, subd. (a)(4), count 2).  As to count one, the information alleged Meier personally inflicted GBI (§§ 667 & 1192.7, subd. (c)(8)).  As to count two, the information charged Meier inflicted GBI causing the recipient to become comatose due to brain injury (§ 12022.7, subd. (b)).

A forensic pathologist testified about Tinsman's injuries and the cause of death.  The pathologist also confirmed a person punched in the face could sustain a one-half by one-half inch lip laceration.  Additionally, the pathologist explained a person punched in the face in that manner could be rendered unconscious due to the force of the blow and sustain a concussion.  The pathologist opined the same person falling backward, and hitting a hard object, could sustain hematomas to the back of the head and an unconscious person would not be able to brace themselves for the fall.  The pathologist also testified a strike to a person's face, causing the person to fall backwards and hit his head on the ground, was consistent with Tinsman's injuries and radiating head fractures.

After the prosecution rested, Meier moved to dismiss the charges pursuant to section 1118.1.  The trial court denied the motion.

Meier testified in his own defense.  In his 14 years of experience as a bar manager, Meier stated he had dealt with many people who had too much to drink or were being rowdy.  He discussed how he would try to diffuse the situation, and he denied fighting or hitting anyone.  On the day of the incident, he went to the bar around 7 p.m. and it was busy with customers, including several Navy personnel.  He stated there was

---

[2]     All further statutory references are to the Penal Code.

8

an altercation involving the Navy people and two out-of-uniform officers took them away in busses. Thereafter, he helped behind the bar and with cleaning. He also left the bar to visit friends at a different bar.

Meier testified that around 1 a.m., he and his girlfriend were too intoxicated to ride their bikes and they called for an Uber ride. Before leaving, Meier walked to the back parking lot to make sure their bikes were securely locked. He recalled a few people were outside, including Tinsman who "had just been asked to leave." Meier testified as follows: "I seen [sic] him earlier in the night getting a little rowdy. From my experiences, he has a couple beers and he just gets aggressive with everyone. He was talking to [Hampshire], and I'm like, hey, [Hampshire], why don't we get out of here and get inside. . . . So I tried to coerce [Hampshire] to get inside, and that's when we started walking in."

Meier stated that at the time he was holding a backpack in his hand, and he intended to go inside the bar. He recalled holding the door open for Hampshire and Murphy, and he intended to help Hampshire over the bump created by the door's threshold. While helping Hampshire navigate the bump with his wheelchair, Meier said he felt Tinsman approach and grab his neck. He could not remember what Tinsman was saying, and opined it was "probably a bunch of gibberish" because Tinsman was angry. Meier testified, "I just kind of deflected and I just kept on minding my own business just to kind of get away from him."

When asked if he did anything aggressive towards Tinsman, Meier replied "No, absolutely not," but at the time he felt threatened. Meier claimed he did not push Tinsman, but rather "wedged [himself] inside the doorway." Meier stated Tinsman "kept on yammering or talking about some murder that happened the night before to his friend . . . and I wasn't paying any attention."

Meier stated that after he opened the door for Hampshire and Murphy, he felt Tinsman's arm on his shoulder. Meier then saw Tinsman try to put his shoulder

9

inside the doorway as Meier was walking through. Meier said Tinsman started hitting him in the kidneys "and I was just panicked at that point . . . ." Meier said Tinsman grabbed his neck, which he did not expect. When asked how he reacted, Meier replied, "I was just trying to get him -- get out of there and push my friend to safety at that point. Like, I wasn't trying to defend myself. I was trying to get in the building and [Hampshire] away from everything."

Meier claimed he felt Tinsman's aggression escalating and Tinsman pulled him backwards. He denied hitting Tinsman. He could not remember seeing Tinsman fall down. He stated, "I just knew he was -- I didn't know if he was running off or he was going backwards and I was out of there." He explained he felt Tinsman was close to his back as they walked inside but as he turned "like I felt him kind of lift off, so I'm, like, okay, maybe he's giving up and he's going to get out of here. Boom, we're done. I didn't have to do anything." Meier then walked to find his girlfriend. He did not know until a few minutes later that Tinsman was on the ground in the back parking lot. Meier stated, "I figured maybe he mouthed off to somebody. I had no idea." He added, "It was not my concern."

Meier claimed he tried to cooperate with the police but he was unable to operate the surveillance video because he was intoxicated. He admitted having one other physical altercation with a bar patron. In 2012, Ryan McCauley physically attacked Meier, and he punched McCauley one time before others were able get McCauley out of the bar.[3]

Defense counsel asked Meier about his interview with the police the following day. He claimed the officers did not ask him any questions about "Tinsman's attacks or aggressive acts towards [him]." He stated they asked questions about whether

---

[3] In rebuttal, the prosecution called Corporal Brian Gray to testify about this incident. He testified about speaking with Meier, who admitted he repeatedly punched McCauley.

10

he had pain or injuries from being hit or grabbed or attacked by Tinsman. When asked to elaborate, Meier said they asked if he was in pain, and he responded that his ribs, head, and knees hurt.

When the prosecutor asked Meier if he told other people Tinsman fell or he had to defend himself against Tinsman, Meier stated, "No" and he was not saying he had to defend himself. Tinsman added, "I'm turning around quickly. Is that defending myself?" He confirmed he did not punch Tinsman but shook him off his shoulder, as seen in the video. The prosecutor asked Meier to explain why Tinsman had a lip laceration, a "split so far you could see his tooth in the autopsy photo, that was from shaking your shoulder?" Meier replied, "I didn't inflict -- I don't know if he hit my head, but a punch was never -- I never punched him." The prosecutor next asked, "So when he was stumbling into the bar, you said you felt him on your back[] [¶] . . . [¶] [and] you spun yourself around, but you never lifted your arm up?" Meier replied he felt Tinsman on his back and maybe he lifted his arm as he spun around, but he did not lift a fist or shove his hand forward. Meier agreed with counsel's statement that despite the traumatic event of someone threatening him and being aggressive, he did not later tell the police he acted in self-defense or text anyone about the altercation. The prosecutor asked if Meier's statements to the police about injured ribs and knees were related to drinking and falling off his bike. Meir claimed his injured ribs were due to Tinsman's punches and conceded he did not tell the police Tinsman hurt him. When asked why, Meier said, "They never asked."

A forensic toxicologist testified that based on his review of the video surveillance, and evidence Tinsman's blood alcohol content (BAC) was .22 at the hospital, Tinsman likely had the same BAC at the time of the incident. He opined a person with that level of alcohol would have balance problems and could fall to the ground. Tinsman's property manager testified she saw him start drinking beers at 6:00 p.m. the night of the incident.

11

The jury found Meier guilty as charged and determined the GBI allegations were true. The court sentenced Meier to a total term of eight years in state prison. The sentence consisted of the midterm of three years for count two plus five years for the GBI enhancement. The court imposed the midterm of three years for involuntary manslaughter but stayed the sentence on this count.

DISCUSSION

I. *Sufficiency of the Evidence*

A. *Was There Evidence Meier Battered Tinsman?*

Meier asserts that both convictions (involuntary manslaughter by an unlawful act and aggravated assault) required evidence he assaulted or battered Tinsman. He claims that no one at trial testified they saw him hit Tinsman, and therefore the evidence was insufficient to support his convictions. We disagree.

"In evaluating whether the judgment is supported by substantial evidence, we review the entire record in the light most favorable to the judgment, presume in support of the judgment every fact that can reasonably be deduced from the evidence in the record and determine whether any reasonable finder of fact could have found that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citation.] We do not reweigh conflicting evidence or reevaluate the credibility of witnesses. [Citation.]" (*People v. Skiff* (2021) 59 Cal.App.5th 571, 579.) The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions. (*People v. Arcega* (1982) 32 Cal.3d 504, 518.)

An assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) An assault is aggravated when committed "by any means of force likely to produce [GBI]." (§ 245, subd. (a)(4).) "Assault requires the willful commission of an act that by its nature will probably and directly result in injury to another (i.e., a battery), and with knowledge of the facts

12

sufficient to establish that the act by its nature will probably and directly result in such injury. [Citation.]" (*People v. Miceli* (2002) 104 Cal.App.4th 256, 269.) Assault is a general intent crime; it is not necessary that the perpetrator intended to injure the victim. [Citation.] It is also not necessary that the perpetrator be subjectively aware of the risk that an injury might occur. [Citation.]" (*People v. Murray* (2008) 167 Cal.App.4th 1133, 1139 (*Murray*).)

"'Manslaughter is the unlawful killing of a human being without malice.' (§ 192.) Involuntary manslaughter is manslaughter during 'the commission of an unlawful act, not amounting to a felony,' or during 'the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).) 'The offense of involuntary manslaughter requires proof that a human being was killed and that the killing was unlawful. [Citation.] A killing is "unlawful" if it occurs (1) during the commission of a misdemeanor inherently dangerous to human life, or (2) in the commission of an act ordinarily lawful but which involves a high risk of death or bodily harm, and which is done "without due caution or circumspection."' [Citation.]" (*Murray, supra,* 167 Cal.App.4th at p. 1140.)

In this case, the prosecution argued the crime of battery was the predicate act for the involuntary manslaughter charge. Battery is "any willful and unlawful use of force or violence upon the person of another." (§ 242.)

We conclude there was sufficient evidence to support the jury's conclusion Meier battered Tinsman. Murphy told a police officer someone punched Tinsman, and at one point confirmed the assailant was Meier. Her report of a battery to the police confirmed her earlier account of the incident to the 911 police dispatcher. The recorded call reflects that immediately after the assault, Murphy exclaimed Tinsman was mouthing off and "somebody at the bar" hit his face. She described the assailant's clothing and reported he ran away. She also offered a possible motivation for the incident, i.e., the

13

assailant "was annoyed" with Tinsman, who was mouthing off.[4] Wagner, who dialed 911, also reported to the police dispatcher that Tinsman was punched. Additionally, a paramedic testified a woman told him Tinsman was punched, and it was a "nice hit." In the briefing, Meier concedes it was likely that the woman who approached the paramedic was Murphy, "as she was apparently the only woman outside of the bar." Thus, witnesses testified about Tinsman getting punched before he fell backwards into the parking lot.

We acknowledge Meier's argument that Murphy's story was untrustworthy because she was intoxicated at the time of the incident and she offered different versions of what transpired. However, in reviewing the sufficiency of the evidence we cannot resolve credibility issues or evidentiary conflicts. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) The jury could reasonably conclude Murphy had a clear view of what transpired because she was standing next to Meier before and after his altercation with Tinsman. She was close enough to try to intervene and break his fall. The surveillance videotape confirms Meier was the only person directly in front of Tinsman before he was struck down. Indeed, Meier admitted he felt Tinsman "on his back" before he quickly spun around to confront him (moments before he fell backwards onto the parking lot pavement). It was reasonable for the jury to conclude Meier, who had a history of being annoyed with Tinsman, was the "someone" Murphy described as being the assailant.

Moreover, the convictions did not rest solely on Murphy's testimony. The paramedic described Tinsman's injuries as including a split lip and bleeding from the back of his head. The two distinct injuries, located on opposite sides of Tinsman's skull, were consistent with two separate blows. Significantly, there was evidence the force of

---

[4] The jury could see obvious similarities between Murphy's and Meier's testimony that Tinsman was annoying. Meier stated Tinsman had a history of "mouthing off" and rubbing people the wrong way. Murphy said someone hit Tinsman because he was "mouthing off" and being annoying.

14

impact to Tinsman's face was powerful enough to tear his lip tissue, leaving exposed the teeth below and a bruised frenulum. It was undisputed Tinsman's head striking the pavement caused injuries to the back of his skull. Tinsman could not have simultaneously injured opposite sides of his head from falling backwards onto the pavement.

Finally, the video surveillance images, while a little blurry, confirm there was a physical altercation between Meier and Tinsman. We acknowledge the footage did not clearly show Meier's fist make direct contact with Tinsman's face. However, plainly visible was a scuffle and sequence of events involving only Meier and Tinsman in close proximity to each other. This footage viewed in the context Tinsman's facial injuries and Murphy's testimony, amply supports the jury's findings. Specifically, the video shows that within a few seconds, Tinsman went from standing directly behind Meier, to facing him in the doorway, to falling like a cut tree onto the parking lot. Tinsman did not put out his hands to brace himself or make any effort to lessen the impact. It was entirely reasonable for the trier of fact to consider and interpret these video images in conjunction with other evidence, including the pathologist's opinion a one-half by one-half-inch lip laceration was consistent with being punched and rendered unconscious.

B. *Was There Evidence Meier was Acting in Self-Defense?*

Alternatively, Meier asserts that if there was evidence he assaulted Tinsman, there was overwhelming evidence he acted in self-defense. Meier explains there was ample evidence Tinsman attacked him first. He points to video images he believes conclusively prove he did not make any aggressive moves towards Tinsman, but rather tried to get away from his attacker. He maintains the video supports his account of Tinsman grabbing his neck and painfully punching his ribs. He refers to his trial testimony that he knew Tinsman became aggressive after a few beers, and it was undisputed Tinsman was highly intoxicated that night.

15

Meier's argument there was sufficient evidence to support a finding of self-defense is not the correct test. As stated in *People v. Brady* (2018) 22 Cal.App.5th 1008, 1018, a case cited by Meier, the question we must decide was whether there was sufficient *evidence for the jury to reject* Meier's claim of self-defense based on a lack of objective reasonableness. In short, the answer is yes. The jury had many reasons to conclude Meier's testimony lacked credibility. For example, Meier's trial testimony contradicted his statements to the police, describing Tinsman as merely annoying and not aggressive. His actions and statements immediately after his altercation with Tinsman were suspect. Meier told one police officer he was not outside with Tinsman but the video footage showed they were together. Moreover, he failed to mention to anyone that he felt threatened and he did not complain about any injuries. Meier overlooks the significance of his trial testimony he did not feel any need to defend himself and simply turned around to face Tinsman. Meier's assertion he did not hit Tinsman or see him fall was strong evidence from which the jury could reject his claim he perceived an immediate threat or the need to defend himself.

Similarly, the jury could reasonably rely on evidence that directly contradicted Meier's assertion the evidence showed danger "was imminent" because he "could not evade the blows." Before Meier turned to strike Tinsman, they were both standing on the threshold of a large open room. Meier was not physically trapped or cornered. Rather, he was walking into an open space full of his friends and co-workers. Significantly, he was the bar owner's son and long-term manager, unlike Tinsman who was not welcome at the bar. In light of this evidence, the jury could reasonably reject Meier's claim he was in imminent danger with no place to go.

Meier also maintains that "even assuming [he] punched or elbowed or hit Tinsman with his shoulder, he did so only one time to defend himself against Tinsman's aggressions." Whether Meier hit Tinsman once or multiple times does not address the question of whether he was acting in self-defense, especially when the single blow

16

resulted in death. Moreover, the jury could reject Meier's claim that one punch was reasonable under the circumstances. The surveillance video footage does not show Tinsman aggressively grabbing Meier's neck. To the contrary, it depicted how Tinsman, highly intoxicated and clearly unbalanced, followed a group of fellow bar patrons towards the bar's door. It appears that he was hoping Meier would allow him to go back inside. Near the doorway, when the group paused for a moment, Tinsman threw his left arm around Meier's neck for what looked like a side hug. He then playfully threw his arms out towards Meier's body, making a few jabs with his fists. The force of these soft punches was doubtful given Tinsman's unstable mannerisms. At one point, Tinsman staggered away from Meier. None of his movements appeared to be particularly forceful or harmful. After the incident, Meier did not complain to friends or the police that Tinsman hurt him. As mentioned, Meier's initial story was that Tinsman was not aggressive and did not react negatively when Meier told him he could not return to the bar.

Other relevant evidence was testimony about Meier and Tinsman's past encounters. Meier repeatedly stated he was uncomfortable with Tinsman's antics, which he attributed to Tinsman having a mental disorder. Meier admitted he would make Tinsman feel unwelcome at the bar and often threw him out. Despite having every opportunity to claim to the police that he was defending himself, Meier never asserted Tinsman had a history of physically threatening him or other customers, or caused him to feel afraid. Although he raised this claim at trial, the jury also heard Meier testify that when he first heard about Tinsman falling down in the parking lot he assumed it was because Tinsman had likely been "mouthing off" to someone else. This testimony was consistent with his statements to the police that Tinsman was annoying, not aggressive. Moreover, it suggested Meier believed Tinsman invited trouble by mouthing off to others.

17

Other witnesses confirmed Meier's statements that Tinsman, intoxicated, had been mouthing off that night. Nobody suggested Tinsman was being aggressive. In light of the evidence challenging Meier's credibility, evidence regarding his past interactions and impressions of Tinsman, and the video footage showing Tinsman's interaction with Meier, we conclude there was sufficient evidence for the jury to reject Meier's claim he had no choice but to hit Tinsman (with his shoulder) as they navigated through the doorway.

## II. *Instructional Error*

Meier contends the trial court prejudicially erred by instructing the jury on mutual combat pursuant to CALCRIM No. 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor) because substantial evidence did not support the instruction. The court gave the instruction, along with CALCRIM No. 3470 (Right to Self-Defense or Defense of Another (Non-Homicide)) and CALCRIM No. 505 (Justifiable Homicide: Self Defense). Neither the prosecutor nor the defense mentioned mutual combat in closing argument to the jury. Meier maintains the instruction prejudiced him by essentially eliminating his claim of self-defense. We disagree.

The court gave the mutual combat instruction as follows: "A person who engaged in mutual combat has the right to self-defense only if: One, he actually and in good faith tried to stop fighting. Two, he indicated, by word or by conduct to his opponent[,] in a way that a reasonable person would understand[,] that he wanted to stop fighting and that he had stopped fighting. And three, he gave his opponent a chance to stop fighting. If the defendant meets [these] requirement[s], he then had a right to self-defense if the opponent continued to fight. [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (See CALCRIM No. 3471.)

The last two sentences of the instruction are noteworthy because they define the term mutual combat as not referring to just any violent struggle between two people. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1050 (*Nguyen*), citing *People v. Ross* (2007) 155 Cal.App.4th 1033, 1044-1045 (*Ross*).) Our Supreme Court adopted the legal definition of mutual combat outlined in the *Ross* decision, stating the following: "[T]he problem with the common definition of 'mutual' is that 'any combat may be correctly described as "mutual" so long as it is seen to possess a quality of reciprocity or exchange. In ordinary speech, then, "mutual combat" might properly describe any violent struggle between two or more people, however it came into being. If A walks up to B and punches him without warning, and a fight ensues, the fight may be characterized as "mutual combat" in the ordinary sense of those words.' [Citation.] *Ross* held that 'mutual combat' refers instead to '"*a duel or other fight begun or continued by mutual consent or agreement, express or implied*. [Citations.]" (Italics added.) In other words, it is not merely the *combat*, but the *preexisting intention to engage in it*, that must be mutual.' [Citation.] Following the decision in *Ross*, the standard instruction was revised to add in brackets: "A fight is *mutual combat* when it began or continued by mutual consent or agreement.' (CALCRIM No. 3471 (rev. Dec. 2008).)" (*Nguyen, supra*, 61 Cal.4th at p. 1050.) Simply stated, self-defense is not available to parties *having a preexisting intention* to fight, unless the defendant actually tried in good faith to stop fighting. (*Id.* at pp. 1049-1050.)

A trial court has a duty to instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Earp* (1999) 20 Cal.4th 826, 885.) Conversely, "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]" (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) "Nonetheless, giving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal.""" (*People v. Cross* (2008) 45 Cal.4th 58, 67.) Giving the jury an instruction

19

that correctly stated the law but had no application to the case "does not appear to be of federal constitutional dimension" and the applicable standard of review for this type of error is the *Watson*[5] standard. (*Guiton, supra,* 4 Cal.4th at pp. 1129-1130.)

The Attorney General asserts Meier is barred from raising this issue because defense counsel requested the mutual combat instruction. It argues such a """"conscious and deliberate tactical choice' to 'request' the instruction" [citation]' [citations]" prevents appellant from challenging its use on appeal. (*People v. Harris* (2008) 43 Cal.4th 1269, 1293.) The record belies this contention. Defense counsel requested that CALCRIM No. 3470 be given in addition to or as an alternative to CALCRIM No. 505 (Justifiable Homicide: Self-Defense). Counsel explained CALCRIM No. 3470 applied to count 2 and the other instruction applied to count 1. The court asked if counsel wanted to modify CALCRIM No. 505 to reflect it "applied just to [c]ount 1, and then CALCRIM Nos. 3470, 3471, and 3472 apply to [c]ount 2?" Counsel agreed that would be better than combining the instructions. The court stated, "I'll modify it, and we will have [CALCRIM No.] 505 be [c]ount 1, and then [CALCRIM Nos.] 3470 through 3472 will be [c]ount 2." Defense counsel did not object when the court mentioned giving CALCRIM No. 3471, but this omission cannot be construed as *an affirmative request* for the instruction. We agree with Meier the claim was not waived.

We also agree with Meier's argument the evidence establishing mutual combat was weak. A finding of mutual combat may be premised on a "preexisting intention to engage in hostilities whenever the opportunity presented itself," such as where there is evidence of an ongoing gang war. (*Nguyen, supra,* 61 Cal.4th at p. 1044 [parties in a "state of war"].) The court heard ample evidence about Meier and Tinsman's strained relationship, and perhaps it could be reasonably inferred they both experienced strong feelings of aggravation. After all, Meier had a history of making

---

[5] *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

20

Tinsman feel unwelcome at the bar. Meier also presented evidence Tinsman became aggressive when intoxicated. On the other hand, our review of the surveillance footage of the events leading up to the single fatal blow simply showed two highly intoxicated, but not particularly violent men, interacting. The parties did not present evidence establishing Tinsman's mindset about Meier nor a preexisting intention to engage in mutual combat. Meier consistently asserted he had no reason to fight with Tinsman and did not set out to interact with him. There does not appear to be very much evidence to support an instruction on mutual combat.

We conclude, however, any potential error in giving the instruction was harmless. As stated by the *Ross* court, a jury instruction that lacks evidence to support it can be held harmless "because juries are said to ignore irrelevant instructions. [Citation.]" (*Ross, supra,* 155 Cal.App.4th at pp. 1055-1056.) Here, the trial court instructed the jury with CALCRIM No. 200, which provides as follows: "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Thus, if the jury determined the parties did not have a preexisting agreement (express of implied) to fight as defined in CALCRIM No. 3471, the jury is presumed to have understood and followed the instructions it was given and disregarded CALCRIM No. 3471. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

Meier notes the *Ross* court declined to rely on this principle to hold harmless the instructional error. But in that case, the jury was not "properly instructed on the meaning of 'mutual combat'" in either the original instruction or in response to the jury's request for further guidance on the concept. (*Ross, supra,* 155 Cal.App.4th at pp. 1042-1043, 1056.) In this respect, the case is factually distinguishable. Meier does not challenge the correctness of the instruction or the legal definition of mutual combat. CALCRIM No. 3471 clearly stated the limitation on self-defense applied only in cases

21

where the fight began or continued by mutual consent or agreement.  The trial court instruction included the post-*Ross* revision clearly defining when the jury should apply the instruction, i.e., when the agreement to fight occurred "before the claim to self-defense arose."  (CALCRIM No. 3471.)  Given the lack of evidence of a preexisting agreement to fight, and the fact that neither the prosecution nor defense mentioned mutual combat in closing argument, we have no reason to doubt the jury's ability to recognize CALCRIM No. 3471 was not applicable.

Another pertinent question in assessing prejudice is whether there was a reasonable probability that, absent the mutual combat instruction, one or more jurors would have entertained a reasonable doubt as to whether the prosecution had proved Meier had not acted in self-defense.  (See *Ross, supra*, 155 Cal.App.4th at p. 1055; *Watson, supra,* 46 Cal.2d at p. 836.)  We have already examined the strength of Meier's self-defense claim in this opinion.  We concluded there was ample evidence supporting the jury's decision to reject Meier's claim he acted in self-defense.  Although Meier stated he was afraid and had no choice in the matter, his statements were refuted by his prior statements to the police and the video surveillance footage.  Even if the instruction on mutual combat should not have been given, it was not reasonably probable a result more favorable would have been reached.  Any error was harmless.

III.  *Sentencing*

Meier asserts the trial court erred by imposing the GBI enhancement on count 2 (assault) because he was convicted of count 2 (manslaughter).  He explains there was a single act causing death, and therefore, the court could not apply the GBI enhancement to a secondary conviction in violation of section 12022.7, subdivision (g). We disagree.

Section 12022.7 imposes mandatory sentence enhancements for crimes which resulted in the infliction of GBI.  Relevant here are subdivisions (b) and (g). Section 12022.7, subdivision (b), provides:  "Any person who personally inflicts [GBI]

22

on any person . . . in the commission of a felony . . . which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature shall be punished by an additional and consecutive term of imprisonment in the state prison for five years." The statute clarifies, "This section shall not apply to murder or manslaughter or a violation of Section 451 or 452" or "if infliction of [GBI] is an element of the offense." (§ 12022.7, subd. (g).) "As used in this section, [GBI] means a significant or substantial physical injury." (§ 12022.7, subd. (f).)

In this case, the court stayed punishment for count 1 (involuntary manslaughter) and imposed the midterm of three years for count 2 (assault), plus five years for the GBI enhancement. The court rejected defense counsel's argument Meier should be sentenced on count 1, which would have resulted in a shorter sentence (§ 193, subd. (b) [two, three, four year triad]). The issue we must decide was whether section 12022.7 applies to other crimes for a defendant who was also convicted of manslaughter, when all convictions related to a single victim.

Both parties cite to *People v. Cook* (2015) 60 Cal.4th 922 (*Cook*), a case where our Supreme Court examined the significance of subdivision (g) of section 12022.7. In that case, defendant caused an automobile accident in which three people were killed and a fourth person was injured. Defendant was convicted of three counts of gross vehicular manslaughter with a GBI enhancement as to the victim who was injured but survived. (*Id.* at pp. 925-926.) The survivor "was not the subject of any other charge or conviction." (*Id.* at p. 925.)

The Supreme Court reasoned, "No one disputes that section 12022.7, subdivision (g), prohibits enhancing a manslaughter or murder conviction for inflicting [GBI] on the person who is the subject of that conviction. The question before us is when, if ever, a manslaughter conviction may be enhanced for the infliction of [GBI] on *other* victims during the commission of the manslaughter." (*Cook, supra,* 60 Cal.4th at p. 925.) After discussing conflicting holdings reached by several appellate courts, the

23

Supreme Court held, "subdivision (g) of section 12022.7 means what it says: [GBI] enhancements do not apply to a conviction for murder or manslaughter. A defendant convicted of murder or manslaughter who also commits crimes against *other victims* may be convicted of those additional crimes and, to the extent the sentencing laws permit, punished separately for them. But the sentence for manslaughter may not be enhanced for the infliction of [GBI] as to anyone." (*Id.* at p. 924, italics added.) In a final footnote, however, the court "express[ed] no opinion regarding the question, not presented here, of whether and, if so, how [GBI] enhancements may attach to other crimes for a defendant who is convicted of murder or manslaughter as well as those other crimes." (*Id.* at p. 938, fn. 3.)

Subsequently, in *People v. Lamb* (2017) 8 Cal.App.5th 137, 143 (*Lamb*), the Fifth District Court of Appeal addressed the question left open in footnote three of the *Cook* opinion. That case involved a defendant convicted of both involuntary manslaughter and assault by means of force likely to produce GBI as to a single victim. As in the case before us, the defendant in *Lamb* punched the victim, who fell on the pavement and died from a brain injury. (*Id.* at p. 141.) The trial court stayed sentences for battery and involuntary manslaughter. It imposed a three-year term for assault plus five years for the GBI enhancement (and other enhancements not relevant to our discussion). (*Id.* at p. 140.)

In addressing "the question *Cook* declined to answer" the *Lamb* court examined the statutory language of section 12022.7, subdivision (g). (*Lamb, supra,* 8 Cal.App.5th at p. 143.) It found "no ambiguity in the statute's language," stating, "we presume the Legislature intended that meaning and that plain meaning controls. [Citation.]" (*Ibid.*) Applying the statute, the court determined the crime of assault was not one of the exempted offenses listed in section 12022.7, subdivision (g), making the case "distinguishable from *Cook*, where the great bodily injury enhancements at issue were actually attached to the defendant's manslaughter convictions." (*Id.* at pp. 143-

24

144.)  The court in *Lamb* examined and adopted the legal analysis set forth in a pre-*Cook* decision, *People v. Martinez* (2014) 226 Cal.App.4th 1169 (*Martinez*).

In the *Martinez* case, defendant questioned if the court had authority to add a GBI enhancement to a charge of furnishing narcotics to a victim who overdoses and dies (when there was also a manslaughter conviction).  (*Martinez, supra,* 226 Cal.App.4th at pp. 1180-1181.)  The court determined defendant's argument was not supported by the plain language of the statute or by case law.  (*Id.* at p. 1184.)  It reasoned as follows:  "Subdivision (g) of section 12022.7 plainly states '[t]his section shall not apply to murder or manslaughter . . . .'  If we were to accept appellant's argument we would have to read that sentence as saying 'this section shall not apply to *any case where a defendant is charged with* murder or manslaughter.'  As the California Supreme Court has explained, '"insert[ing]" additional language into a statute "violate[s] the cardinal rule of statutory construction that courts must not add provisions to statutes. [Citations.]"'  [Citation.]"  (*Id.* at p. 1181.)

While agreeing with the statutory analysis outlined in *Martinez,* the court in *Lamb* questioned the wisdom of imposing additional punishment "merely because section 12022.7, subdivision (g), as written" can be applied to enhance a nonprohibited felony.  However, the court determined there were no legal grounds to reverse because the additional time did not mean the court improperly punished defendant twice.  (*Lamb, supra,* 8 Cal.App.5th at p. 145 ["court stayed defendant's sentence for involuntary manslaughter pursuant to section 654"].)

We agree with the legal analysis of *Lamb* and *Martinez*.  While the plain language of section 12022.7, subdivision (g), clearly prohibits the enhancement as it applies to four specific crimes, it is silent as to whether it applies to other offenses charged in the same criminal proceeding.  In the case before us, Meier was not punished twice because the court stayed his sentence for involuntary manslaughter.  However, we also acknowledge defendant's argument this result encourages a "'pleading shell game'"

25

which the Supreme Court cautioned against in the *Cook* opinion. (*Cook, supra,* 60 Cal.4th at p. 936.)

Meier points out that in 2015 some legislators attempted to amend section 12022.7, to clarify it does not apply to GBI suffered by the victim of murder or manslaughter. (Sen. Bill No. 717 (2015-2016 Reg. Sess.) as introduced Feb. 27, 2015.) However, for the past five years, the legislature has been silent on this issue. "Unpassed bills, as evidences of legislative intent, have little value. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396; see also *Mejia v. Reed* (2003) 31 Cal.4th 657, 668 [declining to draw conclusions about Legislature's intent based on legislative silence].) It is not our role to amend the clear language of a statute or broaden the scope of its application. (See, *Martinez, supra,* 226 Cal.App.4th at p. 1181; *Melissa R. v. Superior Court* (2012) 207 Cal.App.4th 816, 822.)

## DISPOSITION

We affirm the judgment.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.


26